UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MICHAEL AFREMOV,                          CIVIL NO. 09-03678 (PSJ/JSM)

    Plaintiff,                                    ORDER

v.

SULLOWAY & HOLLIS, PLLC et.al.

    Defendants.

This matter came before the Court on Defendants' Second Motion to Compel Production of Documents [Docket No. 183], Plaintiff's Motion to Compel Documents [Docket No. 188] and Defendants' Motion to Compel Answers to Deposition Questions [Docket No. 255].  Justice E. Lindell, Esq. and Sandra K. Kensy, Esq. appeared on plaintiff's behalf in connection with Defendants' Second Motion to Compel Production of Documents and Plaintiff's Motion to Compel Documents and Charles E. Jones, Esq. appeared on behalf of defendants.  Justice E. Lindell, Esq. appeared on plaintiff's behalf in connection with Defendants' Motion to Compel Answers to Deposition Questions. Charles E. Jones, Esq. appeared on behalf of the defendants.  Bryon G. Ascheman, Esq. appeared on behalf of defendants John R. Harrington and Michael M. Lonergan.

The Court, being duly advised in the premises, upon all the files, records and proceedings herein, and for the reasons stated on the record now makes and enters the following Order:

**IT IS HEREBY ORDERED** that **:**

1. Defendants' Second Motion to Compel Production of Documents [Docket No. 183] is GRANTED.

2. Plaintiff's Motion to Compel to Compel Documents [Docket No. 188] is GRANTED.

3. Defendants' Motion to Compel Answers to Deposition Questions [Docket No. 255] is GRANTED in part and DENIED in part.

Dated:  December 2, 2011        *Janie S. Mayeron*
                                JANIE S. MAYERON
                                United States Magistrate Judge

## MEMORANDUM

### I.    BACKGROUND

#### A.    The AGA Litigation, Criminal Investigation, Indictment and Guilty Plea by Afremov

Plaintiff Michael Afremov sued Sulloway & Hollis ("S & H"), a New Hampshire law firm, and Michel LaFond, a member of S & H, in December, 2009.  [Docket 1].  Afremov filed and served an Amended Complaint on March 12, 2010 and a Second Amended Complaint on October 28, 2010 [Docket Nos. 31, 70].  On March 17, 2011, this Court granted Afremov's motion for leave to file and serve a Third Amended Complaint, which added two additional members of S & H as defendants, attorneys John R. Harrington and Michael M. Lonergan.  Order [Docket No. 147].  On June 21, 2011, this Court granted Afremov's motion for leave to serve and file a Fourth Amended Complaint, which added a claim for fraudulent transfer under the Minnesota Uniform Fraudulent Transfer Act.  Order [Docket No. 203]; Order Overruling Objections [Docket No. 226]; Fourth Amended Complaint ("FAC") [Docket No. 204].

2

The facts relevant to the instant motions, as alleged in the Fourth Amended Complaint and in the parties' various pleadings, are as follows: Afremov is an engineer and was one of the founders of AGA Medical Corporation, a medical device corporation based in Minnesota. FAC, ¶1. S & H and LaFond represented Afremov in a lawsuit that he initiated against two of the other co-founders of AGA on or about October 11, 2002 (the "AGA litigation"). Id., ¶13. Afremov's lawsuit alleged that he was wrongfully terminated and deprived of his rights as an AGA shareholder. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment ("Pl. Mem. in Opp. to Summ. J.") [Docket No. 150], p. 2. LaFond hired local counsel in Minnesota to assist with the AGA litigation. FAC, ¶14.

In 2001, and before initiation of the AGA litigation, Afremov received payments from two different AGA suppliers and used portions of the payments for his personal use and to purchase Persian rugs. FAC, ¶¶15-18. Afremov declared these payments as income on his tax returns. Id.,¶18. LaFond believed that the tax treatment of these payments could support certain counterclaims made by the defendants against Afremov in the AGA litigation. Id. LaFond advised Afremov to recharacterize these payments as "advances" to Afremov by the suppliers to buy the rugs for them and not as income, to amend Afremov's 2000 and 2001 income tax returns to remove the supplier payments as income, to not include these supplier payments on his 2002 tax return as income, and to have the suppliers amend their tax returns to remove the deductions they had taken for the payments to Afremov. Id., ¶¶19-22 (the "Tax Filing Scheme").

In February, 2003, local counsel, including a white collar crime specialist, met with LaFond and told him that the Tax Filing Scheme could trigger serious criminal

charges against Afremov. <u>Id.</u>, ¶23. When LaFond made it clear that he was going forward with the Tax Filing Scheme, local counsel withdrew because he was concerned over the potential for criminal liability arising out of the tax and legal advice S & H was providing to Afremov. <u>Id.</u> LaFond did not tell Afremov why local counsel withdrew and instead told Afremov that the "criminal defense specialist had told LaFond that the Tax Filing Scheme would not be a criminal problem and not likely to be of interest to the government." <u>Id.</u>, ¶¶24-25.

Shortly after LaFond's meeting with local counsel in February, 2003, LaFond involved his litigation partners, Harrington and Lonergan, in the AGA litigation and they performed substantial work on this suit for the next two years. <u>Id.</u>, ¶28. Harrington and Lonergan were tasked with finding factual support for the "rug advances" theory that formed the basis for the Tax Filing Scheme, but they could not and told LaFond they had doubts about the veracity of the theory. <u>Id.</u> Nonetheless, with Harrington and Lonergan's knowledge and participation, LaFond continued to assert the rug advances theory in the AGA litigation and continued with the Tax Filing Scheme. <u>Id.</u>, ¶29. In October 2003, Afremov filed the 2002 federal tax return that did not include the AGA supplier payments as income, and in January 2004, Afremov filed amended tax returns for 2000 and 2001, which removed the AGA supplier payments as income. <u>Id.</u> Afremov filed these returns based on advice from LaFond and with Harrington and Lonergan's knowledge and participation. <u>Id.</u> None of the S & H lawyers advised Afremov of the risk posed by the Tax Filing Scheme or "stopped LaFond from implementing his scheme." <u>Id.</u>, ¶30.

In November, 2004, while the AGA litigation was pending, the U.S Attorney served a grand jury subpoena on Afremov.  Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Def. Mem. in Support of Summ. J.") [Docket No. 142], p. 5.  Afremov retained Doug Kelley and the Kelley & Wolter firm ("K & W") to represent him in connection with the subpoena (the "criminal investigation"). Id.  According to defendants, S & H was not Afremov's counsel for the criminal investigation.    Id.    Rather, with K & W's full knowledge and approval, Afremov authorized S & H to assist K & W in connection with the criminal investigation by gathering information responsive to the grand jury subpoenas.  Id.  S & H attorneys also consulted with K & W so that K & W could understand the background of the AGA litigation.  Id.  Afremov, on the other hand, claimed that he and S & H entered into a new agreement in which he hired S & H to provide legal services regarding the criminal investigation.  Pl. Mem. in Opp. to Summ. J., pp. 3, 13.

In December, 2004, K & W, LaFond, and the attorneys representing the AGA suppliers who paid Afremov, Fred Fischer and Brian Packard, signed a joint defense agreement ("JDA") with respect to the criminal investigation.  Def. Mem. in Support of Summ. J., p. 5; Joint Defense Agreement [Docket 128, Ex. A].  The JDA preserved the parties' respective attorney-client privileges and work product protections.  Id., ¶III.  At the same time, the JDA acknowledged that "from time to time, the mutual interests of [the clients would] be best served by sharing documents, factual material, mental impressions, strategies, legal theories, memoranda, interview reports, and other information, including the confidences of each client … ."  Id.

S & H continued to represent Afremov until the end of the AGA litigation, which concluded on July 28, 2005, with the closing of a judicially-ordered buyout in which Afremov received nearly $300 million dollars.  Def. Mem. in Support of Summ. J., pp. 2, 6.

In April, 2005, LaFond retained the Stetler & Duffy law firm to represent him separately.  Pl. Mem. in Opp. to Summ. J., p. 15.  According to Afremov, S & H told him about retaining Stetler & Duffy, but "obscured and misrepresented the purpose of the representation" and led him to believe that Stetler & Duffy was retained to assist on the counterclaims lodged against him in the AGA litigation and not the criminal investigation into the filing of fraudulent tax returns.  Id.

On October 17, 2005, LaFond received a grand jury subpoena to testify in the criminal investigation; on November 1, 2005, the Department of Justice sent a letter to LaFond's counsel, informing him that the Department viewed LaFond "tentatively" as a subject[1] of the criminal investigation; and on November 3, 2005, S & H received a subpoena to produce documents regarding its representation of Afremov.  Id., pp. 15-16; Def. Mem. in Support of Summ. J., pp. 6-7.  Afremov has alleged that "neither LaFond nor anyone else at S & H disclosed to Afremov that LaFond had received this subject letter, or otherwise informed Afremov that LaFond was personally being investigated as a result of his legal advice and direction to Afremov with respect to the Tax Filing Scheme."  FAC, ¶58.  In response to the subpoena, K & W contacted the Assistant U.S. Attorney and asserted that the information sought was protected by

---

[1]     "Subject" is a term of art within the Justice Department and is defined as "a person whose conduct is within the scope of the grand jury's investigation."  United States Department of Justice Criminal Resource Manual, 9-9-11.152As.

attorney-client privilege and the work product doctrine.  Def. Mem. in Support of Summ. J., p. 6.  K & W also asserted that due to the attorney-client relationship between LaFond and Afremov, LaFond could not offer any substantive testimony to the grand jury.  Id.

S & H retained attorney David Vicinanzo of the Nixon Peabody law firm to assist it in responding to the subpoena for documents, including reviewing S & H's documents to determine which documents were responsive and non-privileged and could be produced.  Id., p. 7.

There is no dispute that Afremov agreed to indemnify S & H for Nixon Peabody's and Stetler & Duffy's fees, but nevertheless Afremov alleged:

> In connection with the subpoenas, Defendants requested even more legal fees from Afremov, to pay for S & H and LaFond each to retain criminal defense counsel for themselves in defending against the subpoenas.  S & H once again failed to disclose or seek waiver of the intractable conflicts of interest provided by this situation.  Afremov, believing that Defendants were fighting the subpoenas solely on his behalf, agreed to pay these fees, provided that the fees would be around $150,000, which is what S & H represented in writing.

FAC, ¶60.  In effect, Afremov has alleged that he believed that Stetler & Duffy and Nixon Peabody were retained to represent his interests, and not S & H's and LaFond's separate interests.  Afremov eventually paid approximately $862,400 for Stetler & Duffy and Nixon Peabody's fees.  Declaration of Gerald Fornwald In Opposition to Defendant's Motion for Summary Judgment ("Fornwald Decl."), Ex. 10 (billing summary) [Docket No. 152-1].

The grand jury indicted Afremov in June, 2006.  FAC, ¶62.  In the summer of 2006, Afremov retained Joseph Petrosinelli of Williams &Connolly to replace K&W as

his criminal counsel.    Defendants' Memorandum of Law In Support of Their (First) Motion to Compel Production of Documents Regarding Kelley & Wolter, p. 6. [Docket No. 116].    In March, 2008, Afremov pled guilty to filing false tax returns and a conspiracy to file false tax returns.    Declaration of Charles Jones in Support of Motion for Partial Summary Judgment, Exhibits J (Plea Agreement and Sentencing Stipulation) [Docket 143-10]; K (Transcript of Proceedings, Guilty Plea) [Docket 143-11].

### B.    Defendants' Efforts to Obtain K & W Documents and First Motion to Compel

On September 7, 2010, defendants served Afremov with requests for  production seeking documents regarding K & W's representation of him.    Declaration of Charles Jones in Support of Second Motion to Compel Production of Documents ("Jones Decl."); ¶3 [Docket No. 186-1].    Document Request No. 30 sought "[a]ll documents in your possession, custody or control relating to any communications between Kelley & Wolter and you relating to the criminal proceedings."    Jones Decl., Ex. A (Plaintiff's Responses to Defendants' Request for Production of Documents (First Set), p. 18. Document Request No. 41 sought "[a]ll documents in your possession, custody or control setting forth, constituting or relating to any communications between Kelley & Wolter and Sulloway & Hollis relating to the criminal proceedings."    Id., p. 22. Document Request No. 47 sought "the entire file maintained by K & W in connection with the criminal proceedings."    Id., p. 24.    On October 22, 2010, Afremov's counsel responded to the requests, objecting to Requests Nos. 30 and 47 on the basis of attorney-client privilege and the work product doctrine, but he agreed to produce responsive, non-privileged documents in response to Request 41.    Id., pp. 18, 22, 24.

8

In the interim, on September 23, 2010, Afremov's counsel wrote to Doug Kelley seeking access to K & W's file.  Declaration of Sandra Kensy in Opposition to Defendants' Motion to Compel Production of Documents ("Kensy Decl."), Ex. A (email correspondence from S. Kensy to D. Kelley) [Docket No. 129-1].  On November 8, 2010 K & W made its file available for review by Afremov's counsel.  Kensy Decl., ¶4.  However, Steve Wolter of the K & W firm informed Afremov's counsel that K & W had withheld some documents on the grounds that they were subject to the JDA and that K & W would not produce those documents until it gave notice to the parties to the JDA and provided them with an opportunity to respond.  Id., ¶5.  Further, K & W would not provide notice to the other parties to the JDA unless it received a subpoena.  Id.  Afremov's counsel served a document subpoena on November 16, 2010.  Id., Ex. D (subpoena).  The subpoena sought documents related to the JDA, but also more broadly sought document related to:

- Discussions with Afremov;

- Discussions with Afremov, LaFond, Lonergan, Harrington, or any other members, employees, or agents of Sulloway & Hollis, PLLC;

- Discussions with Joe Duffy or any other members, employees, or agents of Stetler & Duffy;

- Discussions with David A. Vicinanzo or any other members, employees, or agents of Nixon Peabody, LLP.

Id.  Before producing the JDA-related documents, K & W forwarded copies of responses it had received from David Vicinanzo of Nixon Peabody and Corey Rubenstein of Stetler & Duffy in which both attorneys asserted that the materials remained subject to the common-interest, joint-defense privilege.  Id., Ex. G (letter to Steve Wolter of K & W from Corey Rubenstein); Ex. H (letter to Steve Wolter of K & W from David Vicinanzo).

To obtain access to the K & W documents Afremov had subpoenaed from K & W, defendants served a document request on Afremov, which sought "[a]ll documents received by you pursuant to any subpoena served by you or on your behalf in connection with this lawsuit."   Jones Decl., ¶16; Ex. D (Plaintiff's Responses to Defendants' Request for Production of Documents (Set 2), Document Request No. 49).

On December 1, 2010, K & W made documents responsive to Afremov's subpoena available for review and inspection at its offices.   Kensy Decl., ¶9. Defendants' counsel Megan Yelle attended the production "without prior notice." Id. Kensy objected to Yelle's presence at the document production but "agreed she could stay at the production provided that I would be afforded the opportunity to first review all documents and to cull from them any I deemed privileged.   Once I reviewed the documents, then Ms. Yelle could review all documents I deemed non-privileged." Id. Although Kensy stated that S & H's counsel agreed to this procedure, it is clear that the "agreement" was made to avoid further conflict on the day of the document review. Jones Decl., ¶15; Transcript of Proceedings (Motions Hearing) ("Second Mot. to Compel Tr.") [Docket No. 209], p. 121.  Kensy did not allow Yelle to review any documents that she considered to be subject to the attorney-client privilege or the work product doctrine.  Kensy Decl., ¶10.

On December 6, 2010, Wolter wrote to Kensy, "confirm[ing] our conversation during the document production at my offices last week.  As I informed you, we are not producing our attorney notes since, as a matter of longstanding office policy, we believe that such material is privileged, internal work product that belongs to the firm.  If you feel

otherwise, we will be happy to review any authority you wish to provide suggesting that our attorney notes are subject to production." Id., Ex. I.

On December 16, 2010, Afremov's counsel responded to defendants' Document Request No. 49, which sought the documents subpoenaed from K & W, and objected to the request on the following grounds:

> [T]his request seeks documents subject to the attorney-client privilege and the work product doctrine. Plaintiff has not waived any privilege with respect to the files maintained by Kelly, Wolter. Plaintiff has requested portions of the Kelly Wolter files including correspondence, notes and memoranda, and will produce any non-privileged documents at such time as Plaintiff has had an opportunity to review the files to identify such documents as may be subject to privilege.

Jones Decl., ¶16; Ex. D (Plaintiff's Responses to Defendants' Request for Production of Documents (Set 2)).

On February 16, 2011, defendants moved this Court for an order compelling Afremov to produce all documents regarding K & W's representation of Afremov, including all documents he obtained pursuant to the November 16, 2010 subpoena. Defendants' Memorandum of Law in Support of Motion to Compel Production of Documents Regarding Kelley & Wolter ("Def. Mem. in Support of Mot. to Compel K & W Docs."), [Docket No. 116] pp. 11-12. Defendants argued that Afremov had waived any attorney-client privilege he possessed based on the allegations of professional misconduct against K & W, the joint defense agreement that he admits existed between

11

him, K & W and S&H in the criminal investigation, and his allegations in this case.  Id.,

pp. 24-25.[2]

This Court denied defendants' motion to compel the production of the K & W

documents without prejudice, in part because at the time of the hearing, Afremov had

not produced non-privileged documents or prepared a privilege log.  Order, March 7,

2011, p. 8 [Docket No. 137].  This Court explained:

> In light of the current record, the Court denied defendants'
> motion to the extent that it sought a finding that there had
> been a general waiver of attorney-client privilege as to all of
> the documents in the K & W file.  Without knowing
> specifically what documents were produced or are going to
> be produced to defendants, what documents were or are
> going to be withheld, and the basis for withholding of each
> document, this Court cannot make any determination as to
> whether there has been a general or specific waiver of the
> privilege.

Id.

Eventually, Afremov produced some documents responsive to Document

Request No. 49, and a series of privilege logs describing the documents withheld,

culminating in the Second Amended Privilege Log at issue in defendants' Second

Motion to Compel Documents.   Jones Decl., ¶¶17-22; Ex. E (Second Amended

Privilege Log of K & W documents).   Defendants believe that Afremov's counsel

withheld more than 1000 documents from the K & W production.  Jones Decl. ¶21.

---

[2]    Since defendants' first motion to compel the production of the K & W documents,
the focus of the dispute has shifted from Afremov's claim that the K & W documents are
attorney-client privileged (see Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion to Compel [Docket 127], pp. 8-10) to his claim, reflected on the
Second Amended Privilege Log, that the documents are protected by the work product
doctrine.   Jones Decl., ¶22; Ex. E (Plaintiff's Second Amended Privilege Log).
According to this privilege log, Afremov has not withheld any K & W documents on the
basis of attorney-client privilege.  Id.

12

The Second Amended Privilege Log identified K & W as the author of all of the documents withheld, and universally identified "work product" as the basis for withholding the documents. Jones Decl., Ex. E. The recipients are identified generally as "K & W" or "file," with a few entries listing "Dennis, Shepard Data Services," "Shepard Data" or "Christine/Dennis Shepard Data Services" as recipients. Id., pp. 8, 9. The log also contains many pages of entries identifying K & W as the author and describing the documents as "attorney typed comments regarding review of documents." Id., pp. 56-72.

At the hearing on defendants' second motion to compel, Afremov's counsel stated that it was his law firm's decision, and not the decision of K & W, to identify the documents as protected by the work product doctrine.[3] Second Mot. to Compel Tr., p. 66. There was no consultation with Kelley as to whether he agreed with Afremov's counsel's characterization of the documents. Id. Afremov's counsel also confirmed his understanding that K & W held back what they considered to be their work product. Id., p. 67 (Mr. Lindell: "[n]ow, my understanding is that there are handwritten notes and other things that were not turned over to us by Kelley & Wolter because they're saying that this is their work product, that they own their stuff, and we don't have that, so it's not part of any of this." The Court: "So they have handwritten notes by members of the Kelley & Wolter firm that they have not produced?" Mr. Lindell: "That's my

---

[3]    This representation was consistent with the testimony of Doug Kelley at his deposition at which time he stated that he did not participate in the decision by Afrevmov's current counsel to withhold documents based on the work product doctrine. Declaration of M. Gregory Simpson in Support of Motion to Compel Answers to Deposition Questions ("Simpson Decl."), Ex. A (Kelley Dep.), p. 10 [Docket No. 258].

understanding."  The Court:  "Because they take the position that that's their work product."  Mr. Lindell:  "That's my understanding.").

### C.    Afremov's Claims and Defendants' Motion for Partial Summary Judgment

One of the key allegations in Afremov's suit against defendants is that S & H developed an unwaivable conflict of interest with Afremov in light of LaFond's role in the Tax Filing Scheme, and particularly when LaFond knew that he was criminally implicated in the Scheme.  Pl. Mem. in Opp. to Mot. Summ. J., p. 14 (citing Fornwald Decl., Ex. 56 (LaFond's handwritten note dated March 22, 2005 stating "Conflict of Interest-Issue-when should I discontinue representing Mike-charging fees for the McCloskey Report file."[4]) [Docket No. 152-3].   As damages, Afremov seeks the disgorgement of all legal fees he paid to S & H, both in connection with the criminal investigation and with the underlying AGA litigation.  FAC, Prayer for Relief, ¶1.

Defendants concede that an unwaivable conflict of interest between S & H and Afremov arose when Afremov pled guilty in March, 2008.  Defendants' Memorandum of Law in Support of Second Motion to Compel Discovery ("Def. Mem. in Support of Second Mot. to Compel") [Docket No. 185], p. 5.  However, until then, their position is that there was no conflict because Afremov's interests and S & H's interests were completely aligned (i.e. documenting what S & H understood were Afremov's legitimate rug transactions).  Id., pp. 3-4; Def. Mem. in Support of Summ. J., pp. 3-6; Declaration of Michael Lonergan in Support of Defendants' Motion for Summary Judgment, ¶16 [Docket No. 144].   Furthermore, "[t]o the extent that a theoretical conflict of interest

---

[4]    The "McCloskey Report" was S & H's internal term for the criminal investigation. Pl. Mem. in Opp. to Summ. J., p. 14.

arose before [Afremov's] guilty plea, it was discussed among K & W, Afremov and S & H," and K & W waived the conflict on behalf of Afremov through his "open awareness and acceptance, and reliance upon S & H's assistance."  Def. Mem. in Support of Second Mot. to Compel, p. 6; Def. Mem. in Support of Summ. J., p. 18.

In short, defendants contend that their advice to Afremov regarding the amendment of his income taxes was proper based on information it received from Afremov and others regarding the payments he received from AGA suppliers to purchase the rugs.  Def. Mem. in Support of Second Mot. to Compel, p. 3.  According to defendants:

> S & H did its level best to substantiate and effectively advocate the story plaintiff consistently told.  Even if some part of the rug story is false, plaintiff conceived it all by himself and doggedly stuck to it right up to the moment in March 2008 when he pleaded guilty to avoid a prison sentence.  S & H will therefore show that its advice and conduct did not result in a conflict of interest that would make retention of fees improper, and that the plaintiff alone is responsible for the financial consequences of his rug story and the tax returns that he signed under oath.

Id., pp. 3-4 (citation omitted).[5]

---

[5]    Suffice it to say, the parties' theories on the conflict issue has "evolved" over time.  For Afremov's part, while it is true that since the commencement of the suit, he has taken the position that defendants were obligated to withdraw from their representation of him due to an irreconcilable conflict, when that conflict arose appears to have changed over time: he has alleged that the conflict arose as early as LaFond's advice to Afremov that he amend the tax returns; to June, 2004 when LaFond was put on notice by opposing counsel in the AGA litigation that the IRS was seeking to investigate the kickbacks alleged as a counterclaim; to August 2004, when opposing counsel in the AGA litigation sent to Afremov's attorneys articles addressing the criminal liability of attorneys who assist their client in tax fraud; to November, 2004 when Afremov received subpoenas in the criminal investigation; to October, 2005 when subpoenas were served on LaFond; to November, 2005, when LaFond was put on notice that he too was the subject of the investigation.

Defendants additionally maintain that no conflict of interest arose before Afremov pled guilty to the tax charges because K & W, not S & H, directed Afremov's defense to the criminal investigation and S & H's activities in connection with this investigation were at the direction of, and in close cooperation with K & W.  Def. Mem. in Support of Second Mot. to Compel, p. 5.

On March 16, 2011, defendants moved for partial summary judgment based in part on their theory that Afremov had no claims against S & H or its lawyers for any of their conduct after November, 2004, when K & W began its representation of Afremov. Def. Mem. in Supp. Summ. J., p. 2.  Defendants argued that K & W's knowledge of S & H's ongoing representation of Afremov during the criminal investigation was imputed to Afremov.  Id., pp. 16-17.  "Thus, to the extent K & W attorneys knew of the relevant facts and circumstances, their knowledge is imputed to plaintiff and plaintiff cannot allege that he lacked knowledge of what K & W knew.  Further, plaintiff cannot contend that K & W's acts are not binding upon him."  Id., p. 17.

---

Defendants, on the other hand, started from the premise that they had disclosed any potential conflicts to Afremov and any alleged conflict had been impliedly waived by Afremov as evidenced by Kelley's role in the criminal investigation and the various acts he performed on behalf of Afremov.  Transcript of Summary Judgment Hearing ("SJ Tr.") [Docket No. 181], p. 23, 39-40. This theory was premised on their belief that (a) any potential conflict had been disclosed to Afremov by LaFond and a request for a waiver of the conflict was communicated by LaFond to Afremov; or (b) Kelley's knowledge of S & H's potential conflict was imputed to Afremov, and was impliedly waived by Kelley on behalf of Afremov.  Def. Mem. in Support of Summ. J., pp. 15 n. 3, 16-19, 28-29.  SJ Tr. pp. 9-10, 37-38, 23, 39-40.  Defendants now appear to have distanced themselves from their contention that Afremov via Kelley had impliedly waived any conflict, and instead have focused solely on the theory that there was no conflict because their interests were in complete alignment with Afremov's interests. Notably, the expert reports issued by S & H and LaFond make no mention of a disclosure of a conflict by defendants, request for a waiver of conflict by defendants to Afremov, or any express or implied waiver of a conflict by Afremov.  See Declaration of Justice Ericson Lindell, November 21, 2011 [Docket No. 306], Exs. A-D.

During the summary judgment hearing, Judge Schiltz referenced the lack of a

fully developed record several times and what Kelly knew and when:

> Mr. Jones:  Kelley was on the case for two years.  And there
> isn't anything in the record that would allow Your Honor to
> come to the conclusion—the plaintiff hasn't argued it and
> there isn't anything out there to suggest that Kelley didn't
> know what was going on.  And I think that's a key part of my
> argument.
>
> The Court:  I could not begin from the record in front of me to
> figure out what Kelley knew and when Kelley knew it.
>
> Mr. Jones:  There isn't an affidavit from him.  That's very true.

Transcript of Summary Judgment Hearing ("SJ Tr.") [Docket No. 181], p. 23 (emphasis

added).

> The Court:  You say in your brief, for example… "This joint
> defense agreement in and of itself demonstrates K & W's
> awareness of any issue that might have existed concerning
> S & H's interest in the criminal investigation."  No it doesn't…
> I have absolutely no idea what Doug Kelley knew one month
> after he had been retained by Afremov.  There is no record
> on this at all.  The notion that because he signs the joint
> defense agreement with Sulloway that that necessarily
> means he knows exactly what Mr. LaFond's role was, he has
> recognized any potential conflict, he has talked to Afremov
> about the conflict, he has decided that the advantages of
> using Sulloway outweigh the potential risk, the fact that he
> entered a joint defense agreement doesn't tell me any of that
> stuff.  That's not in the record.  I'm not saying that Kelley's
> involvement is irrelevant on your theory of the facts.  I agree
> with you.  I agree.  But I'm here today on Afremov's version.
> And on Afremov's version, Kelley could not waive the
> conflict, so it doesn't matter what he did because LaFond
> was a co-conspirator, an aider and abetter with Afremov;
> can't waive the conflict.
>
> Mr. Jones:  All I can do is just say there is no fact in the
> record to support that.
>
> The Court:  "Then you can come back on your next summary
> judgment saying there [are] no facts on the record.  But your

17

next summary judgment motion will be after discovery.  We are not going to keep doing these while discovery is open.

Id., p. 44 (emphasis added).

Mr. Jones:  Part of our motion is that the record shows that Mr. Kelley…has been representing plaintiff for a full year. There has been a lot of activity that has gone on in that full year. And, you know, there is the subject letter that they make a big deal out of, which Mr. Kelley knows about.  I think that's now the state of the record.  His knowledge—this is one of the key points of our motion.

The Court:  I presume, as you point out, that if Afremov really did this all at LaFond's insistence that sometime during this year he might have mentioned that to his criminal defense attorney. I assume that.  You might have a good argument.  You need the discovery and I need to see that. I mean, I need to have Kelley tell us what he knew as of November of '05 and why he decided, despite knowing of the subject letter and despite knowing A, B, and C to go ahead.  It's entirely possible you could win this, but not on the record I have before me today.
                                        ***
Moreover, we put to one side a separate, independent claim of Afremov's is that he was induced to pay for Nixon Peabody's work by false statements as to what Nixon Peabody would be doing.  Again, you need evidence of what it was they said to him.

Id., p.73 (emphasis added).

The Court:  On Afremov's version of the facts, Sulloway shouldn't have been involved in the case at all.  They had an irremediable conflict, a near unwaivable conflict.  They shouldn't have been making the request with Kelley.  Kelley can talk to them through their attorney, but they shouldn't have done it.  On Afremov's version of the facts, Kelley—I just don't know.  Kelly to do any of these decision[s] in a binding, legally proper way has to have certain knowledge.  I don't know what Kelley has.

Mr. Jones: Okay

The Court:  I presume, as you presume, that a year into the litigation he knows an awful lot, but I don't have it in front of

<u>me.  I don't have an affidavit from Kelley.  I don't have a
deposition of Kelley as to what he knew at the time.</u>

Id., p. 79 (emphasis added).

In discussing Afremov's alleged agreement to pay Nixon Peabody's fees, Judge

Schiltz noted:

> The Court:  So for [Afremov] to be obligated to pay for it he
> has to reach a valid agreement, contract to pay for it.  And if
> you induce that with a false statement as to what Nixon
> Peabody would be doing, it's not a valid agreement.  I just
> frankly haven't though how the conflict thing---again, you
> brought a summary judgment motion early in discovery, and
> I just don't know what it's going to look like.  Who exactly is
> doing the suggesting? What exactly is Kelley being told by
> Sulloway?  I just don't know that.  <u>I've got to know what
> Afremov knows, what Kelley knows, what Sulloway is telling
> them</u> to know whether there might be some other
> impediment to you keeping the million dollars or Nixon
> Peabody keeping whatever.  I just can't on this record say as
> a matter of law that you have to keep that money and he has
> no claim to that money, not on his version of the events.

Id., p. 81 (emphasis added).

In discussing Doug Kelley's role with Afremov's counsel, Judge Schiltz

commented:

> The Court:  <u>And the record doesn't tell us what Kelley knew
> and when Kelley knew it, which is one reason I can't grant
> summary judgment</u>, but suppose Kelly—let me take one step
> back for a second.  I take it you deny that this conversation Mr.
> Jones says occurred where there actually was a
> discussion with Afremov about conflicts of interest and so
> on, that you deny that happened?
>
> Mr. Lindell:  Yes, 100 percent, Your Honor.  And further,
> Your Honor, is this an argument about implicit waiver of
> attorney-client privilege.  They came forward and said here's
> what was communicated to Mr. Kelley.  We copied him on it.
> He was copied on the subject letter.  We let him know this.
> We gave him these documents.  If it is was true that there
> was a conversation with Mr. Kelley where all this was walked

through, we wouldn't be here on an implied constructive nonsense waiver theory, Your Honor.  They would have come in and said no, no, no, I talked to Doug and this is what I said and he said it was okay, and then this would be a completely different issue.  There is no reason for them to bring a motion based on implicit waiver if there is any evidence in the record that there were actually had consultation and a request for a waiver and then received a waiver….I think there should be an order by this Court with regard to that these guys were conflicted out after at least March of 2005 because it doesn't matter what Kelley knew if it's irreconcilable.  And it doesn't matter what Kelley knew if there wasn't a consultation and a request for consent, which under the law you can't have implied waiver—consent could be implied, but the consultation and the request for consent can never be implied.

***

The Court:  Let me ask you this: Did Mr. Afremov tell Mr. Kelley that this was all Mr. LaFond's idea?

Mr. Lindell:  Your Honor, that would be an attorney-client communication. I don't literally know the answer to that, and I wouldn't answer the question -- respectfully, Your Honor, I wouldn't answer the question if I did.

The Court:  No, it's fine. You have to protect him. There is nothing wrong at all telling the judge your question asks for privileged information. Actually, the judge would rule whether that's true, but you certainly need to assert it if you believe that that's true.

Mr. Lindell:  Absolutely.

The Court:  I'm just trying to think of the privilege waiver issue here.  So you would say only you can waive the privilege with Kelley, and you haven't asserted any claims or defenses in this that that necessarily waive that privilege.

Mr. Lindell:  Absolutely right.  We cannot use it as a sword and shield, and we haven't.

The Court:  And to the contrary, your claim is that there was an unwaivable conflict here.  And you have been consistent in your brief in saying that.  Kelley is basically utterly irrelevant to your theory of the case.  It doesn't make any

20

<u>difference what he knew, what he said because it was an
unwaiveable conflict.</u>

<u>Id.</u>, pp. 136-137, (emphasis added); pp.139-140 (emphasis added).

Judge Schiltz denied defendants' motion for partial summary judgment and noted
that "[p]inning down exactly when the conflict arose, exactly when it became
unwaivable, that's going to depend upon the facts that have to be developed. * * * I want
you all to get your discovery done, get your factual record set, and then you can bring
cross motions for summary judgment… ." SJ Tr., p. 144; Order, April 27, 2011 [Docket
No. 179].

### D.    <u>Current Motions Before the Court</u>

Shortly after Judge Schiltz denied defendants' motion for partial summary
judgment, defendants renewed their motion to compel the production of the K & W
documents. Additionally, following the depositions of Kelly and Afremov, defendants
moved to compel them to answer questions they refused to answer based on attorney-
client privilege or the work product doctrine. Also before this Court is Afremov's motion
to compel documents.

## II.    DEFENDANTS' SECOND MOTION TO COMPEL DISCOVERY OF THE K & W
DOCUMENTS [Docket No. 183]

Defendants have renewed their motion to compel production of the K & W
documents on two grounds: (1) Afremov waived his claim to work product protection by
subpoenaing the documents; and (2) Afremov impliedly waived his right to claim work
product protection. Def. Mem. in Support of Second Mot. to Compel pp. 14-18.
Additionally, through their second motion to compel, defendants have sought
documents in Afremov's personal possession that he has failed to produce in response

to discovery that was served on September 7, 2010. Id., pp. 24-25; Jones Decl., ¶¶3-5. In support of this motion, defendants maintained that one of the key reasons Judge Schiltz denied summary judgment was that defendants had failed to establish that Doug Kelley's representations to S & H, made on Afremov's behalf, were made with full knowledge of all of the relevant facts. Jones Decl., ¶29. Further, defendants argued that Afremov's position that he is entitled to the K & W documents, but defendants are not, "serves to deny S & H access to information that Judge Schiltz has expressly stated is relevant to the [parties'] claims and defenses." Def. Mem. in Support of Second Mot. to Compel, p. 7. Based on the descriptions of the withheld documents provided on the Second Amended Privilege Log, defendants contended that the documents withheld show: K & W was directing S & H's activities; K & W put significant effort into establishing the truth of Afremov's "rug story," such as obtaining valuations of the rugs; K & W, after "lengthy investigation," never took the position that the rug story was false; K & W "knew every fact that plaintiff contends should have been disclosed to him by S & H as part of a conflict waiver;" and that K & W, after knowing all of the relevant facts, did not believe that the Government's interest in LaFond materially limited LaFond or S & H's ability to continue representing Afremov. Id., pp. 8-9.

### A.    Loss of Work Product Protection Through Service of the Subpoena

Defendants initial argument was that Afremov's use of a subpoena to obtain the K & W documents now precludes him from asserting that the documents are protected by the work product doctrine. Def. Mem. in Support of Second Mot. to Compel, p. 15. Relying on Rules 26 and 45 of the Federal Rules of Civil Procedure and cases construing the relationship between these Rules, defendants asserted that it is

"elementary" that documents obtained by a subpoena are equally available to all parties. Id., pp. 15-16. According to defendants, the scope of discovery pursuant to a Rule 45 subpoena is as broad as the scope of discovery as defined by Rule 26, which permits the discovery of non-privileged and relevant information. Therefore, by serving the subpoena, defendants reasoned that Afremov has conceded that the K & W file is relevant and non-privileged. Id., p. 16.

None of the cases on which defendants rely for this novel theory hold that service of a subpoena results in a loss of privilege or work product protection. Rather, the cases simply state that the scope of a Rule 45 subpoena is as broad as the scope of discovery generally permitted by the federal rules. See Williams v. Blagojevich, Civ. No. 05-C-4673, 2008 WL 68680 at *3 (N. D. Ill., Jan. 2, 2008) ("[t]he scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules"); Stewart v. Mitchell Transp., Civ. No. 01-2546, 2002 WL 1558210 at *3 (D. Kan., July 8, 2002) (same); Richmond v. UPS Serv. Parts Logistics, Civ. No. IPO1-1412, 2002 WL 745588 at *2 (S.D. Ind., April 25, 2002) (same); Graham v. Casey's Gen. Stores, 206 F.R.D. 251, 252 (S. D. Ind. 2002) ("[t]he scope of materials obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules"); Alper v. United States, 190 F.R.D. 281, 283 (D. Mass. 2000) (procuring documents through a Rule 45 subpoena constitutes discovery); Peyton v. Burdick, Civ. No. 07-453, 2008 WL 880573 at *1 (E. D. Cal. Mar. 31, 2008) (noting that a "majority of courts hold that the use of a [Rule] 45 subpoena constitutes discovery. . ."); see also Marvin Lumber & Cedar Co. v. PPG Indus., 177 F.R.D. 443, 444 (D. Minn. 1997) (Rule 45 subpoenas are a method of "discovery" under R. 26).

Merely because the scope of a Rule 45 subpoena has been described by some jurisdictions as co-extensive with discovery under Rule 26 does not lead to the inevitable conclusion that Afremov has waived his right to claim that some of the documents are protected by the work product doctrine.  In fact, the Court reaches the opposite conclusion—that the work product and attorney-client privilege protections afforded to documents and information pursuant to Rule 26 extends to documents obtained by a Rule 45 subpoena.  Rule 26 explicitly states that "[p]arties may obtain discovery regarding <u>any nonprivileged matter</u> that is relevant to any party's claim or defense… ."  Fed. R. Civ. P. 26(b)(1).

Furthermore, the requirement of Rule 45(b)(1) that a party intending to serve a subpoena notify other parties in advance, does not trigger an automatic loss of work product protection for the documents being subpoenaed as maintained by defendants. Def. Mem. in Support of Second Mot. to Compel, p. 15 (citing <u>Coleman-Hill v. Governor Mifflin Sch. Dist.</u>, 271 F.R.D. 549, 552 (E.D. Penn. 2010)). In <u>Coleman-Hill</u> the court stated that "[t]he purpose of prior notice is to afford other parties an opportunity to object to the production or inspection and to obtain the materials at the same time as the party who served the subpoena."  271 F.R.D. at 552.  That single sentence does not mean that documents subject to production through a subpoena lose their privilege or work product status.  Rather, the court was simply emphasizing that the prior notice requirement is designed to prevent the serving party from obtaining documents surreptitiously and to provide its opponent the chance to object before the production. That issue is not present here.

But rejecting the defendants' argument regarding waiver of work product protection for the K & W documents based on Afremov's service of a Rule 45 subpoena, does not end the Court's analysis regarding defendants' access to the K & W documents. For the reasons discussed more fully below, this Court has concluded that Afremov has impliedly waived his right to shield the K & W documents from discovery on the basis of work product protection, and must produce all of the documents withheld by him to defendants.

**B.    Afremov Has Waived His Separate Interest in K & W's Work Product**

In a case in federal court based on diversity, the Court "applies federal law to resolve work product claims and state law to resolve attorney-client privilege claims." Baker v. General Motors Corp., 209 F.3d 1051, 1053 (8th Cir. 2000) (citing Simon v. G.D. Searle & Co., 816 F.2d 397 (8th Cir.1987) (cert. denied, 484 U.S. 917, (1987)). See also Union County, Iowa v. Piper Jaffray & Co., Inc., 525 F.3d 643, 646 (8th Cir. 2008) ("Because this is a diversity case, the determination of whether attorney-client privilege applies is governed by state law."); PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP, 305 F.3d 813, 817 (8th Cir. 2002) ("This Court applies federal law to work product claims."). Afremov has not withheld any of the K & W documents on the basis of attorney-client privilege. Therefore, the Court focuses its analysis regarding the K & W documents exclusively on the work product doctrine and will apply federal law to its analysis, as the Court has diversity jurisdiction over the matter. FAC, ¶8.

The attorney work product doctrine was first articulated in Hickman v. Taylor, 329 U.S. 495, (1947), and is now expressed in Fed. Rule Civ. P. 26(b)(3)(A)(ii), which provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered … if: … (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

The work product doctrine prevents "unwarranted inquiries into the files and mental impressions of an attorney" and "recognizes that it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." Simon, 816 F.2d at 402 (internal quotation omitted). The "scope of the work product protection is broader than that afforded by the attorney-client privilege since items protected by the work product doctrine are not confined to confidential communications between an attorney and a client, but extends to protection of all 'documents and things' that have been prepared in anticipation of litigation, or for trial." Onwuka v. Federal Express Corp., 178 F.R.D. 508, 512 (D. Minn. 1997) (citing Fed. R. Civ. P. 26(b)(3)); see also In re Murphy, 560 F.2d 326, 337 (8th Cir.1977).

Work product is categorized as "ordinary" work product, which includes "raw factual information," and "opinion" work product, which includes "counsel's mental impressions, conclusions, opinions or legal theories." In re Green Grand Jury Proceedings, 492 F. 3d 976, 980 (8th Cir. 2007). As described by Rule 26, ordinary work product may be discoverable on a showing of substantial need and an inability to secure the substantial equivalent of the materials without undue hardship. Fed. R. Civ. P. 26(b)(3)(A)(ii). On the other hand, opinion work product, which is described in Rule 26(b)(3)(B), "enjoys a nearly absolute immunity and can be discovered only in very rare

26

and extraordinary circumstances." In re Murphy, 560 F.2d at 336; Pittman v. Frazer, 129 F.3d 983, 988 (8th Cir. 1997) (same); see also In re Green Grand Jury Proceedings, 492 F. 3d at 980 (recognizing that opinion work product enjoys "substantially greater protection than ordinary work product."); Bieter v. Blomquist, 156 F.R.D. 173, 179 (D. Minn. 1994) ("opinion work product is virtually immune from discovery.")  Thus, even if a party can meet the requirement of substantial need, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. Rule Civ. P. 26(b)(3)(B).

The work product doctrine "[b]alance[s] the needs of the adversary system to promote an attorney's preparation in representing a client against society's interest in revealing all true and material facts relevant to the resolution of a dispute."  Pamida, Inc. v. E. S. Originals, Inc., 281 F.3d 726, 732 (8th Cir. 2002) (citing Hickman, 329 U.S. at 510-11).  At the same time, the doctrine should be "applied in a commonsense manner in light of reason and experience as determined on a case-by-case basis."  Pamida, 281 F.3d at 732 (quoting Pittman, 129 F. 3d at 988).

The work product protection extends to documents prepared both in anticipation of litigation and litigation that has been terminated, In re Murphy, 560 F.2d at 334, but the heightened protection afforded attorney work product during ongoing litigation is not conferred on an attorney's work product for a completed case.  See Pamida, 281 F.3d at 730 ("But [the three-prong test articulated in] Shelton[v. American Motors Corp., 281 F.3d 726 (8th Cir. 2002)] was not intended to provide heightened protection to attorneys who represented a client in a completed case.")

The work product protection is not absolute. Pamida, 281 F.3d at 732 (citations omitted). In addition to the loss of the protection through a showing of substantial need and undue hardship by the party seeking the materials, the protection may be waived. United States v. Nobles, 422 U.S. 225, 239 (1975); In re Murphy, 560 F.2d at 334 ("In Nobles, the defense attorney attempted to use an investigator's report, characterized by the Court as work product, to impeach the Government's witnesses. The Court concluded that the work product privilege was waived when the defense elected to make a testimonial use of the material contained in the work product."). Waiver may result from the disclosure of work product materials to an adversary. See In re Chrysler Motors Corp., 860 F.2d 844, 846 (8th Cir. 1997) (disclosure to an adversary waives work product protection as to items actually disclosed). A court may also find that there has been an implied waiver of work product protection when the party claiming the protection has brought an action "in which the information allegedly protected is crucial and unavailable by other means." Pamida, 281 F.3d at 732. As the Eighth Circuit noted in Pamida:

> With respect to the issue of implied waiver, the Court must not only look at whether [a party] intended to waive the privilege, but also whether the interests of fairness and consistency mandate a finding of waiver. Wigmore, Evidence in Trial at Common Law, §2327 at 636 (J. McNaughton rev. 1961)). 'When a party seeks a greater advantage from its control over work product than the law must provide to maintain a healthy adversary system, the privilege should give way.' In re Sealed Case, 676 F.2d 793, 818 (D. C. Cir. 1982).

Id.

Even the nearly absolute immunity of attorney opinion work product may be lost if a client places his attorney's opinions into direct issue by, for example, designating his

attorney as an expert witness.   Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P., 210 F.R.D. 673, 677 (D. Minn. 2002) (citing Hager v. Bluefield Reg'l Med. Ctr., Inc., 170 F.R.D. 70, 78 (D.D.C. 1997)).   This jurisdiction has not yet decided whether "at-issue" waiver applicable to attorney-client communications results in the waiver of attorney work product.[6]   See Baker 209 F.3d at 1055 ("The [plaintiffs] contend that at-issue waiver of attorney client privilege would necessitate a finding of waiver for any work product protection.   We are skeptical of this argument…however we need not resolve this issue because we find the [plaintiffs'] argument for at-issue waiver of the attorney client privilege fails on the merits") (citing In re Martin Marietta Corp., 856 F.2d 619, 626 (4th Cir.1988) (waiver of attorney client privilege does not waive opinion work product)).   Other circuits have applied "at-issue waiver" to work product.   See e. g., John Doe Co. v. United States, 350 F.3d 299, 302 (2nd Cir. 2003) (gathering cases applying "at issue" waiver to work product); Maplewood Partners, L.P. v. Indian Harbor Ins. Co., Civ. No. 08-23343, 2011 WL 3918597 at *6 (S. D. Fla. Sept. 6, 2011) (applying "at issue waiver of work product immunity" to opinion work product).   However, at the end of the

---

[6]     Both parties devoted significant portions of their briefs to describing how the factors influencing a court's decision to find waiver of attorney-client privilege described in Medtronic v. Intermedics, Inc., 162 F.R.D. 133, 135 (D. Minn. 1995) applied to this motion.   Def. Mem. in Support of Second Mot. to Compel, p. 18-20; Pl's Mem. in Opp. pp. 13-18.   Under this test, if a party establishes that: (1) assertion of the privilege is a result of an affirmative act; (2) through the affirmative act, the asserting party has placed the protected information at issue by making it relevant; and (3) the application of the privilege would deny the opposing party information vital to its defense, then the court may order the production of attorney-client privileged documents.   Medtronic, 162 F.R.D. at 135.   But Afremov has not withheld any documents on the basis of attorney-client privilege.   Therefore, the Court found the parties' analyses under Medtronic to be of little assistance or application.

day, there may be little practical difference between the concept of placing protected information "at issue" by making it relevant in a lawsuit, and the concept that the information is "crucial and unavailable by other means." <u>Pamida</u>, 281 F.3d at 732. Under both theories of waiver, the emphasis falls on the nature of the information sought and access is determined by considering fundamental fairness. <u>See</u> <u>Minnesota Speciality Crops</u>, 210 F.R.D. at 676 ("Nevertheless, at its heart the fundamental inquiry as to the scope of the work product waiver is…a matter of fairness.").

Afremov argued that the heightened protection afforded to opinion work product should apply in this case. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Compel ("Pl's Mem. in Opp. to Doc. Motion") [Docket No. 194], pp. 20-21.[7] However, Afremov's counsel made no effort to distinguish opinion work product from ordinary work product on the privilege log. Remarkably, before K & W produced documents pursuant to the Afremov subpoena, K & W withheld what it described as its "attorney notes," indicating that it considered such materials protected. Kensy Decl., Ex. I (letter dated December 6, 2010 from Steven Wolter to Sandra Kensy). According to S & H's counsel, K & W withheld some 4000 pages of documents from the production. Second Mot. to Compel Tr., p. 69. The obvious conclusion is that the "attorney notes" K & W withheld represent K & W's own view that these documents constitute their opinion work product.

---

[7] At the motions hearing, Afremov's counsel singled out the privilege log entry indicating "Memorandum regarding Hank Shea comments," (Jones Decl., Ex. E, p. 1, entry dated 1/12/2005) and stated that this document was "flat, on its face, opinion work product, as a factual definition." Transcript of Proceedings ("Second Mot. to Compel Tr.") [Docket No. 273], p. 96. While it may or may not be the case that this particular entry represents opinion work product, the log contains hundreds of additional entries that Afremov has not categorized by ordinary work product and opinion.

Nevertheless, K & W's independent determination that the documents it produced were <u>not</u> subject to work product protection does not prevent Afremov from independently claiming that the documents are protected.  <u>See</u> <u>In Re Green Grand Jury Proceedings</u>, 492 F.3d at 980 (quoting <u>United States v. Under Seal (In re Grand Jury Proceedings #5</u>, 401 F.3d 247, 250 (4th Cir. 2005)) ("'Because the work product privilege protects not just the attorney-client relationship but the interests of attorneys to their own work product,' both the attorney and the client hold the privilege.'")).  However,

> [t]he party asserting the attorney-client privilege or the work product doctrine bears the burden to provide a factual basis for its assertion.  <u>See</u> <u>Hollins v. Powell</u>, 773 F.2d 191, 196 (8th Cir. 1985).  This burden is met when the party produces "a detailed privilege log stating the basis of the claimed privilege for each document in question, together with an accompanying explanatory affidavit" from counsel. <u>Rabushka ex. rel. United States v. Crane Co.</u>, 122 F.3d 559, 565 (8th Cir. 1997) (applying the test to both attorney-client privilege and the work product doctrine).

<u>Triple Five of Minn., Inc. v. Simon</u>, 212 F.R.D. 523, 527-28 (D. Minn. 2002); <u>see</u> <u>also</u> <u>Burke v. Messerli & Kramer</u>, Civ. No. 09-1630 (ADM/AJB), 2010 WL 2520615 at *3 (D. Minn., June 15, 2010) (concluding that defendant failed to meet its burden to assert attorney-client privilege because it made only a blanket assertion of privilege in response to discovery requests, which does not suffice to meet the burden); <u>In re Zurn Pex Plumbing Prods. Liab. Litig.</u>, Civ. No. 08-1958 (ADM/RLE), 2009 WL 1178588 at *1 (D. Minn., May 1, 2009) ("A party can meet this burden by 'produc[ing] a detailed privilege log stating the basis of the claimed privilege for each document in question,

together with an accompanying explanatory affidavit of its general counsel.'") (citing Rabushka ex. rel. United States v. Crane Co., 122 F.3d 559, 565 (8th Cir. 1997)). [8]

In opposing defendants' motion to compel the production of the K & W documents, Afremov did not even attempt to meet his burden to provide the requisite factual basis for claiming that the documents were all protected by the work product doctrine, much less constituted opinion work product. There is no declaration or "explanatory" affidavit from K & W (or any of Afremov's lawyers, for that matter), of the type required by Triple Five. Indeed, all the Court has before it is: (a) Afremov's blanket assertion in his opposition memorandum that the K & W documents are all protected by the work product doctrine; and (b) the privilege log, which for every entry identified the author as "Kelley & Wolter," contains cursory descriptions of the documents,[9] and

---

[8]     In Triple Five, the court found that the defendants, who were resisting discovery on basis of privilege, met their burden by furnishing a comprehensive, sworn statement from their in-house counsel regarding his personal review of the documents and his determination of which documents were protected by attorney-client privilege and the work product protection. Triple Five, 212 F.R.D. at 528; see also Rabushka, 122 F. 3d at 565 (affirming district court's denial of motion to compel discovery because defendants provided a sufficient factual basis for assertion of privilege through by producing a detailed privilege log and affidavit of its general counsel).

[9]     Adding the words "memorandum" or "attorney typed notes" to the entries on the privilege log, does not lead this Court to conclude that the entries represent attorney work product. See, e.g., Marens v. Carrabba's Italian Grill, Inc., 196 F.R.D. 35, 38 (D. Md. 2000) ("Once…the requesting party challenges the basis for the assertions of privilege in a motion to compel, however, the responding party must then do more than rely on a privilege log that gives two word justifications for the assertion of the privilege."); Branch v. Mobil Oil Corp., 143 F.R.D. 255, 256 (W.D. Okla. 1992) ("[M]obil offered no proof whatsoever that the memoranda were attorney-client privileged communications other than bare labels or captions on the memoranda. Although Mobil may have met its burden by submission of the affidavit it now submits to the Court on appeal, that is a question the Court declines to pass upon."); Resolution Trust Corp. v. Diamond, 137 F.R.D. 634, 643 (S.D. N.Y. 1991) ("While the RTC has labeled approximately one-fourth of these documents as 'legal analysis,' 'legal opinion,' 'legal

made no effort to distinguish ordinary work product from opinion work product.  See e.g. Jones Decl., Ex. E, pp. 14-29 (all entries on these pages state "attorney typed comments regarding review of documents.").[10]  Neither the memorandum nor the log are sufficient to meet Afremov's burden to establish the application of the work product doctrine, or more critically, the heightened protection afforded by the opinion work product doctrine.  See Evans v. United Fire & Cas. Ins. Co., Civ. No. 06-6783, 2007 WL 2323363 at *4 (E.D. La., August 9, 2007) ("The mere assertion of a lawyer in [an] opposition memorandum or in the privilege log that materials were prepared in anticipation of litigation is not evidence sufficient to bear the burden.") (emphasis in original).  Significantly, the fact that Kelley, himself, did not withhold any of these documents on the basis that they constituted opinion work product and provided no affidavit to support Afremov's assertion that they reflected Kelley's work product, causes this Court to reject Afremov's blanket claim that the documents warranted opinion work product protection.

    For all of these reasons, this Court finds that Afremov has failed to meet his burden to provide a factual basis for his assertion that the K & W documents are protected by the work product doctrine (whether ordinary work product or opinion work

_____

strategy,' 'legal recommendations,' or 'legal advice,'…the court cannot accept such paltry and self-serving descriptions.").

[10]    To the extent that Afremov may be relying on the declaration of Sandra Kensy to support his claim that the documents are all protected by the work product doctrine, this Court rejects that argument.  Kensy's declaration only states in the most general terms that she reviewed the K & W documents and would not let defendants' counsel see any document she considered attorney-client privileged or work-product protected.  Kensy Decl., ¶10.  Afremov did not attempt to correlate Kensy's opinions with any documents on the privilege log, and there is no evidence that Kensy participated in the creation of the privilege log.  Kensy's declaration does not meet the standard described in Triple Five.

product).   On this basis, Afremov is ordered to produce the withheld documents to defendants.

Independent of the above determination, this Court also finds that defendants have established that they have a substantial need for the materials, which they cannot obtain elsewhere without substantial hardship pursuant to Fed. R. Civ. P. 26(b)(3)(A). Pursuant to the precepts expressed in Pamida there has been an implied waiver of the work product protection as to the documents, and this is one of those rare cases where even if the documents withheld do constitute opinion work product, they should be produced.

Afremov has alleged that there was an irreconcilable conflict of interest between S & H and himself pursuant to Rule 1.7 of the Minnesota Rules of Professional Conduct, which provided:

> A lawyer shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interests, unless:
>
> > (1) the lawyer reasonably believes the representation will not be adversely affected; and
> >
> > (2) the client consents after consultation.

Pl. Opp. to Summ. J., pp. 17-18 (quoting Minn. R. Prof'l Conduct 1.7 (2004)).  Based on this Rule, Afremov has maintained without equivocation, that "[t]he law is clear: Attorneys cannot possibly represent clients in a criminal matter where their own actions may be implicated in the crimes for which their client is being investigated." Id., p. 18.  It is an understatement to say that defendants disagree.  Based on Rule 1.7, defendants now contend that to respond to the allegations of irreconcilable conflict, they must and will prove, that there was no conflict of interest between them and Afremov at any time

before Afremov's plea to tax fraud because up until that time, their interests were completely aligned.[11]    Only if the Court accepts Afremov's version—that the conflict of interest was irreconcilable and unwaivable under all circumstances—does what Doug Kelley knew and when he knew it become irrelevant.  But at this stage of the case, that assertion is hotly contested.  Defendants are adamant that their representation of Afremov was not materially limited by their own interests (i.e. there was no conflict) for two reasons: first, because their interests and Afremov's interests were completely in sync until Afremov's change of the facts and plea; and second, because of the presence and role of Doug Kelley in directing Afremov's response to the criminal investigation. Thus, under defendants' view of the case, Kelley's knowledge of the operative facts regarding S & H's involvement in the criminal investigation is crucial to defendants' ability to defend themselves against Afremov's allegations and to support their contention that there was no conflict.  There can be no doubt that the discovery of the K & W documents sought by defendants could lead to the discovery of admissible evidence bearing on the claims and defenses in this case and clearly falls within the permissible scope of discovery described by Fed. R. Civ. P. 26(b).  And there can be no question, as Judge Schiltz made abundantly clear during the summary judgment hearing, that what Kelley knew and when he knew it is critical to this case, and Kelley himself is the only source of his knowledge.

Additionally, Afremov has made other allegations that put Kelly's knowledge directly at issue.  For example, Afremov alleged that neither LaFond nor anyone else at

---

[11]    As noted in fn. 5, it appears that defendants no longer are asserting that Afremov impliedly waived any conflict through the retention of K & W and the services it provided on his behalf in concert with S & H

S & H ever told him that LaFond had received the "subject" letter from the Department

of Justice, and therefore, Afremov could not waive any conflict because he did not know

a conflict existed.   FAC, ¶58; Pl. Mem. in Opp. to Second Mot. to Compel, p. 3-4.[12]

Afremov has also alleged:

> In connection with the subpoenas, Defendants requested
> even more legal fees from Afremov, to pay for S & H and
> LaFond each to retain criminal defense counsel for
> themselves in defending against the supoenas.  S & H once
> again failed to disclose or seek waiver of the intractable
> conflicts of interest presented by this situation.  Afremov,
> believing that Defendants were fighting the subpoenas solely
> on his behalf, agreed to pay these fees,… .

FAC, ¶60.

This Court agrees with defendants that Kelley's knowledge and understanding of

K & W's role in the criminal investigation (i.e. what he knew and when he knew it) has

been put directly at issue by Afremov's claim that there was a conflict of interest

between defendants and himself (whether waivable or not, which of course, is "the

$64,000 question").    Further, Kelley's knowledge and discussions with Afremov

regarding the DOJ's inquiry into LaFond's role in the tax filing scheme, and agreement

by Afremov agreement to pay the costs and fees of S & H's and LaFond's separate

representation in connection the criminal investigation, has been put into play by

---

[12]     Doug Kelley testified in his deposition regarding Afremov's awareness that
LaFond was a subject of the criminal investigation based on conversations that he had
with Afremov in the presence of LaFond.  Declaration of M. Gregory Simpson in Support
of Motion to Compel Answers to Deposition Questions ("Simpson Decl."), Ex. A
(transcript of deposition of Doug Kelley), p. 91 [Docket No. 258].   However, based on
the attorney-client privilege, Afremov objected to and instructed Kelley not to answer
questions regarding any conversations he had with Afremov in which he informed
Afremov that the Government had identified LaFond as a subject of the investigation.
Id., p. 90.  Based on the work product doctrine, Afremov also objected to and instructed
Kelley not to answer questions regarding whether it was ultimately Kelley's decision to
assert or not assert the advice of counsel defense.  Id., p. 92.

Afremov's allegations and is crucial to their defense. Additionally, as discussed in more detail below in connection with defendants' motion to compel responses to deposition questions directed to Kelley and Afremov, this Court is at a loss to understand why Afremov should be permitted now to deny defendants access to Kelley's opinions, mental impressions and legal theories, when defendants were permitted access to and were privy to them (at least in part), during the course of their joint representation of Afremov.

Finally, Kelley is a critical source of this information. While the defendants may have records regarding their own conversations with Kelley and copies of emails or other correspondence with him that support their position, Afremov still disputes defendants' knowledge and role in the Tax Filing Scheme and the criminal investigation. What defendants need—Kelley's own knowledge and understanding of the issues described above—is available only from Kelley himself.

The Court is mindful of the Eighth Circuit's admonition to balance the interests of our system of justice in promoting the confidentiality of an attorney's work product against a societal interest in "revealing all true and material facts" relevant to the resolution of a dispute. <u>Pamida</u>, 281 F.3d at 732. In this case, the protection of the work product doctrine must give way to disclosure. In making his claims regarding defendants' conflict of interest, Afremov has impliedly waived any work product protection he may seek to assert in K & W's work product, and the documents described on Afremov's privilege log must be produced.

On or before December 19, 2011, Afremov shall produce to defendants all documents withheld from the K & W files based on the work product doctrine.

C.    **Production of Documents in Afremov's Possession**

Afremov argued that defendants' motion to obtain the documents and information stored on Afremov's personal computers, was "not ripe" because while he had not yet produced any information, he was searching for the information and his counsel had informed defendants' counsel that they would "inform [them] when that had occurred." Fornwald Aff., Ex. K (correspondence from Fornwald to defendants'' counsel dated May 6, 2011).

Defendants pointed out that Afremov has produced thousands of pages of documents from sources <u>other</u> than his personal files.  Defendants contended that a review of S & H's electronically stored information showed that during the AGA litigation, S & H sent "hundreds and perhaps thousands" of emails to Afremov at an email address Afremov now says is no longer in use.  Def. Mem. in Support of Second Mot. to Compel, p. 25.  In response, Afremov's counsel asserted that they have taken steps to review the electronic information on Afremov's computers and that they will produce non-privileged documents once the review is complete.  Pl. Mem. in Opp. to Doc. Motion, p. 24.

Afremov has provided no plausible explanation as to why a search of his electronic files had not been completed some nine months after S & H served its discovery.  "Discovery of documents applies to electronic data compilations from which information can be obtained only with the use of detection devices.  Moreover, it is a well-accepted proposition that deleted computer files, whether they be e-mails or otherwise, are discoverable…during discovery, the producing part has an obligation to search available electronic systems for information demanded."  <u>Antioch Co. v.</u>

Scrapbook Borders, Inc., 210 F.R.D. 645, 652 (D. Minn. 2002) (internal quotation and citations omitted).  To the extent that Afremov has not yet completed a search of his computer files, he shall do so immediately and produce documents responsive to the defendants' requests on or before December 15, 2011, along with a privilege log describing all documents he has withheld on the basis of attorney-client privilege or the work product doctrine.

III.  **DEFENDANTS' MOTION TO COMPEL ANSWERS TO DEPOSITION QUESTIONS [Docket No. 255]**

    A.  **Background**

Defendants' counsel deposed Doug Kelley on August 4, 2011.  Simpson Decl., Ex. A (Kelley Dep.).  Afremov's counsel repeatedly instructed Kelley not to answer questions on the basis of attorney-client privilege and the work product doctrine.  See Defendants' Memorandum of Law in Support of Motion to Compel Answers to Deposition Questions ("Def. Mem. in Support of Mot. to Compel Answers") [Docket No. 260], pp. 3-9 (chart summarizing questions asked and the basis for the instruction not to answer).  Kelley was represented at his deposition by attorney David L. Sasseville.  Simpson Decl., Ex. A (Kelley Dep.), p. 2.  Defendants moved for an order requiring Kelley to answer the disputed questions.

On August 2, 2011, defendants deposed Afremov who also was instructed on several occasions not to answer questions based on the attorney-client privilege and work product doctrine.  See Simpson Decl., Ex. B (Afremov Dep.).  Consequently, defendants also moved for an order requiring Afremov to answer these questions

The Court briefly summarizes the positions of defendants and Afremov regarding this motion.

According to defendants, Afremov has claimed that a conflict of interest arose: (1) from the inception of the allegedly fraudulent Tax Filing Scheme; (2) when the parties became aware of the DOJ investigation in late 2004; (3) when S & H and LaFond received the grand jury subpoenas in October, 2005; or (4) when LaFond received the "subject letter" in November, 2005. Def. Mem. in Support of Mot. to Compel Answers, pp. 12-13. To establish that a conflict of interest existed between S & H and Afremov at any one of these points in time, defendants asserted that Afremov has to establish the existence of a conflict, whether it was waivable, whether it was waived, and what the resulting damages were. Id., p. 13.

To defend themselves against Afremov's claims, defendants contended that they will show that there was no conflict of interest until March, 2008, when Afremov "abandoned his claim of innocence and agreed to try to implicate LaFond as a co-conspirator" when he pled guilty to tax fraud. Id. Defendants indicated that they intend to establish that their advice to Afremov regarding the rug story was proper, was based on the facts provided to defendants by Afremov and others, and was consistent with an attorney's professional duty to "resolve doubts about the veracity of testimony or other evidence in favor of the client." Id., p. 14 (citing Minn. R. Prof. Conduct 3.3, 2005 comment, ¶8.).

Defendants maintained that Afremov's contention that their involvement in the criminal investigation was improper opens the door to facts regarding the scope of their involvement in the investigation, and the allocation of responsibility during the investigation between S & H and K & W. Id., pp. 14-15. Defendants further argued that to the extent that Afremov was claiming that he did not agree or authorize Kelley to tell

S & H and LaFond that he would pay for their separate counsel, those facts and the scope of Kelley's authority were now critical to their defense.  Id., pp. 16-26.

Additionally, at the motion hearing, defendants pointed to the following statement in Afremov's memorandum of law in opposition to their motion for partial summary judgment: "[t]he law is clear:  Attorneys cannot possibly represent clients in a criminal matter where their own actions may be implicated in the crimes for which their client is being investigated."  Transcript of September 26, 2011 Proceedings ("Sept. 26. 2011 Tr."), p. 12 [Docket No. 273].  According to defendants, this statement raised many issues, such as:

> What's the scope of representation? Who is doing what on behalf of whom?  What assistance is Sulloway providing to Mr. Kelley?  What authority does Mr. Kelley have with respect to Sulloway's involvement?   What information does Kelley have with respect to---to what degree Mr. LaFond may have been implicated at that point in time.

Id.

In addition, defendants argued that that Kelley is the sole source for information critical to issues such as Kelley's knowledge of S & H's work on Afremov's behalf during the criminal investigation, the extent to which Kelley approved of S & H's activities, and whether or not S & H's involvement affected Afremov's criminal defense.  Def. Mem. in Support of Mot. to Compel Answers, p. 26.  According to defendants, they can only prove the non-existance of a conflict of interest by learning Kelley's legal strategy, and Kelley is the only source for that information.  Defendant's Reply Memorandum of Law in Support of Their Motion to Compel Answers to Deposition Questions [Docket 269], p. 6.

Afremov responded that he has not placed Kelley's knowledge "at issue" and defendants cannot demonstrate "substantial need" or "undue hardship," much less the heightened requirements for disclosure of an attorney's mental impressions. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel ("Pl. Mem. in Opp. to Dep. Motion"), p. 7-20 [Docket No. 264]. Afremov's view of the conflict issue is that because "LaFond had both designed and implemented the Tax Filing Scheme that was the subject of the DOJ Investigation, Defendants knew that they could never properly and ethically represent Afremov in connection with that matter," and defendants' representation of Afremov in the DOJ Investigation was therefore "a direct, substantial and irresolvable conflict of interest which Defendants failed to disclose to him." Id., p. 5 (citing FAC, ¶55). According to Afremov, Kelley's knowledge is irrelevant because the conflict issue implicates only the defendants' actions, not Kelley's, and because the waiver issue can be decided as a matter of law, without reference to what Kelley knew or when he knew it. Id., p. 10. In summary, the thrust of Afremov's argument on the conflict issue was:

> [the] existence of a conflict of interest may be determined solely by looking to Defendants' conduct that could constitute a conflict of interest, not what Kelley knew of Defendants' conduct, or how Defendants' conflict did or did not impact Kelley's mental impressions. To the extent a conflict of interest existed, it is Defendant's conduct that created such a conflict, not Kelley's knowledge of the same.

Id., p. 16.

Afremov conceded that his allegations placed "at issue" the existence of a conflict of interest, waivability of the conflict, what defendants disclosed to Afremov, and whether Afremov waived the conflict, "to the extent one existed." Id., p. 20.

Nonetheless, Afremov asserted that these issues can be "objectively analyzed" without reference to privileged communications or work product.  Pl. Mem. in Opp. to Dep. Motion, p. 20.  According to Afremov, defendants already possess all the facts relating to these issues or can obtain them from third parties.  Id.; see also Sept. 26. 2011 Tr., p. 37 (Mr. Lindell: "[a]nd we're not objecting to finding out what did they talk to Doug Kelley about.  What instructions did he give them.  What strategy did he tell them.  Anything that Doug Kelley told him.  The whole question of what role did Sulloway & Hollis play in the criminal defense they already know.  And the question of what were their instructions, what was their understanding of the strategy, they already know that.  And we have never stopped them from asking Mr. Kelley what his conversations were with them; what his strategy was.")

After the motion hearing, defendants' counsel wrote an unsolicited letter[13] to the Court, pointing to a declaration of Afremov's expert Richard Painter submitted in connection with Afremov's response to defendants' motion for partial summary judgment, in which Painter stated that "[t]he purported evidence discussed by defendants in their motion papers merely suggests that K & W may have known some facts about S & H's involvement in the tax returns, some facts about S & H being a

---

[13]    This Court, unlike the Local Rules, permits the moving party to serve a short reply brief in connection with any nondispositive motion.  Defendants did that in connection with this motion.  See Docket No. 269.  Nevertheless, after the hearing, the parties submitted four unsolicited letters to this Court (which the Court filed so as to make these communications part of the record in this case).  See Dockets Nos. 292, 293, 294 and 295.  Although the Court considered these letters in deciding this motion, the Court does not condone this practice.  To the extent that the parties had something more to say after briefing and oral argument on the motion, the proper procedure was to request permission to file supplemental briefs.  The Court expects counsel to comply with this procedure in the future and will reject any unsolicited letters filed by the parties following the hearing on a motion.

subject of the criminal investigation, and some facts about S & H's representation of

Afremov in this some investigation."   Declaration of Richard Painter ("Painter Decl."),

¶11 [Docket No. 151] (emphasis added).   According to defendants, "[t]his sentence

acknowledges that the extent of Mr. Kelley's knowledge of the relevant facts would

affect the determination whether any conflict was consented to."  Letter from Charles

Jones to Court dated September 27, 2011, p. 2 [Docket No. 292].  Afremov's counsel

disagreed, arguing that defendants had taken excerpts of Painter's declaration out of

context and that Painter had explicitly state that Kelley's knowledge was irrelevant

because knowledge does not constitute consent to a conflict:

> A client's knowledge—much less a client's lawyer's
> knowledge—of information about a conflict of interest does
> not constitute a client's consent to the conflict.

Letter from Justice Ericson Lindell dated September 28, 2011 (quoting Painter Decl.,

¶11) [Docket No. 293].[14]

---

[14]      The Painter Declaration was submitted by Afremov to counter that part of defendants' motion for summary judgment that sought dismissal of Afremov's malpractice claims on grounds that he had failed to comply with Minnesota law that requires a party asserting a malpractice claim against an attorney to submit to his opponent a complete and substantive disclosure of the opinions of an expert that the attorney committed malpractice.  Def. Mem. in Support of Summ. J., pp. 21-32.  In support of their argument that Painter's expert opinions were deficient, defendants argued that Painter failed to address the fact that Afremov was separately and independently represented by K & W; it was K & W who made the decision to resist the Government's subpoenas to S & H based on the attorney-client privilege and work product doctrine; K W was aware of the relevant facts bearing on S & H's representation of Afremov with respect to the filing of the tax returns; K & W waived on behalf of Afremov any conflict by consenting to S & H's involvement in the criminal investigation; K & W made its own determination as to whether S & H's involvement would adversely affect K & W's representation of Afremov; and K & W was aware that LaFond was the subject of the criminal investigation.  Id., pp. 27-30.

        While the parties clearly do not agree on how to interpret the opinions rendered by Painter in his declaration regarding the impact of Kelley's representation on the

On October 7, 2011, defendants' counsel communicated to the Court again following Michael Lonergan's deposition, which took place on October 4, 2011. Letter from Charles Jones to Court dated October 7, 2011 [Docket No. 294]. According to counsel, during this deposition, Lonergan was asked by Afremov's counsel whether Kelley recommended that LaFond retain separate counsel "because LaFond was going to be---was the [    ] subject of a threatened indictment?" Id. However, during Kelley's deposition, when defendants' counsel asked Kelley why he had recommended that LaFond obtain separate counsel, Kelley was instructed not to answer on the basis of work product protection. See Simpson Decl., Ex. A (Kelley Dep.), p. 68. According to defendants, the question Afremov's counsel posed to Lonergan was evidence that Afremov had placed at issue Kelley's knowledge and understanding regarding the

---

conflicts issue, what is clear to this Court is that Painter did not opine that S & H's alleged conflict of interest was categorically unwaiveable, Instead, Painter stated:

> In any event, S&H's conflict of interest in the criminal investigation was <u>almost certainly not waivable</u> under Rule 1.7. It is inconceivable <u>in most circumstances</u> for a lawyer who is himself a potential target in a criminal investigation to represent a client in connection with that same investigation, particularly when advice of counsel is one of the most obvious defenses to criminal charges that might arise from that investigation.

Painter Decl., ¶10 (emphasis added). In this Court's view, by using such conditional language, Painter left open the door for the possibility that there may be some set of circumstances in which an attorney who is the subject of the same criminal investigation as his client may continue to represent the client. This interpretation is consistent with the comments to Rule 1.7 which state "[i]f the probity of a lawyers' own conduct in a transaction is in serious question, it <u>may</u> be difficult or impossible for the lawyer to give a client detached advice." Comments to Minn. R. Prof'l Conduct 1.7 (emphasis added). The commentators did not unequivocally declare such a situation an unwaivable conflict. Presumably, they used the word "may" to allow for a different result.

retention of the Stetler & Duffy firm to represent LaFond.[15]  Afremov's counsel denied

that in asking Lonergan about <u>his</u> understanding regarding Kelley's recommendation,

that Afremov had opened the door to inquiry about Kelley's reasons for recommending

separate counsel.  Letter from Justice Ericson Lindell to Court dated October 7, 2011

[Docket No. 295].

The questions at issue from Kelley's deposition and the basis for the instruction

not to answer (along with the page number of the deposition) are as follows:

| No. | Questions to Doug Kelley | Obj. | P. |
|-----|--------------------------|------|-----|
| 1. | "Can you tell me what those discussions [i.e., discussions by Kelley with Mr. Afremov without Mr. LaFond being present before Kelley's firm was retained] entailed?" | A/C | 12 |
| 2. | "How was the decision made with respect to imparting some of the content of communications with Mr. Afremov but not other content?" [With reference to testimony that Kelley reported to LaFond some communications with Afremov but not others]. | WP | 25 |
| 3. | "Did you appreciate at that point, then, even in November of '04, that there was some possibility that Mr. LaFond's actions would be implicated in the investigation that was being—[interrupted by objection]" | WP | 29 |
| 4. | "So based upon this memo [Memo from Steve Wolter to Doug Kelley regarding cases in which attorneys aid their clients in evading income taxes] did you appreciate no later than November 15, 2004 that there was a possibility that the actions of Mr. LaFond in working with Mr. Afremov to file certain tax returns or amended tax returns could implicate Mr. LaFond in the investigation?" | WP | 33 |
| 5. | "Did that memorandum [regarding ethical rules on the right of an attorney to believe a client's explanation] -- or those communications that you've just mentioned have any reference to Mr. LaFond's ability to believe Mr. Afremov's explanation of the transactions during the time Mr. LaFond represented Mr. | WP | 43 |

---

[15]    Although it is not clear from counsel's letter, the Court construes counsel's juxtaposition of these two excerpts to mean either that the door has been opened to questions regarding the scope of Kelley's authority to bind Afremov to pay Stetler & Duffy's fees, or that it opens the door to Kelley's knowledge and understanding of the potential conflict between LaFond and Afremov as a result of the criminal investigation.

| | Afremov?" | | |
|---|---|---|---|
| 6. | "Do you remember anything that Mr. Afremov said with respect to the substance of the rug transactions or the amended tax returns at these meetings [among signatories to the joint defense agreement]?" | A/C | 47 |
| 7. | "In any meeting between yourself and Mr. Afremov, did he ever tell you that any of the testimony in the AGA case was false?" | A/C | 51 |
| 8. | "And the testimony [in the AGA case] being the testimony that he offered in the AGA case.  Did he ever tell you that he signed sham or fake documents at the instruction of Mr. LaFond?" | A/C | 51 |
| 9. | "In those meetings – I'm sorry, in meetings separately between you and Mr. Afremov, did he ever tell you any facts that suggested to you that he believed that Mr. LaFond was a co-conspirator in any plan to file false tax returns to cover up fund transfers from Mr. Packard and Mr. Fischer?" | A/C | 51-52 |
| 10. | "Did [Afremov] ever tell you that he believed that Mr. Packard or Mr. Fischer's testimony in the AGA case was false?" | A/C | 52 |
| 11. | "Did [Afremov] ever tell you that Mr. Packard or Mr. Fischer signed sham or fake documents at Mr. LaFond's instruction?" | A/C | 52 |
| 12. | "Did [Afremov] ever tell you that Mr. Packard or Mr. Fischer signed false or sham documents at Mr. Afremov's instruction?" | A/C | 52 |
| 13. | "Did you ever learn facts to suggest to you that Mr. Packard believed that his testimony in the AGA litigation was false?" | A/C | 53 |
| 14. | "Did you ever learn of facts independent of discussions with Mr. Afremov which suggested to you that Mr. Packard believed that he had offered false testimony in the AGA case?" | WP | 53 |
| 15. | "Did you ever learn of facts independent of communications with Mr. Afremov to suggest to you that Mr. Fischer believed that he had offered false testimony in the AGA case?" | WP | 53 |
| 16. | "Did you ever learn of facts independent of communications from or with Mr. Afremov to suggest that either Mr. Packard or Mr. Fischer believed that they had signed false or sham documents at the instruction of either Mr. LaFond or Mr. Afremov in connection with the AGA case?" | WP | 53 |
| 17. | "Did you ever learn of facts to suggest that the information Mr. Eichten [a Kelley associate attorney] reported learning from Mr. Melemed [Afremov's accountant] in this memorandum was false?" [with reference to a report on a meeting with Melemed on December 3, 2004] | A/C WP | 56 |
| 18. | "So why did you discuss tactical or strategy issues with the | WP | 61 |

| | Sulloway & Hollis firm?" | | |
|---|---|---|---|
| 19. | "What was your understanding of whatever problems Mr. LaFond may have had at this point?"  [With reference to problems mentioned in a memo by a Kelley associate regarding a conversation with Melemed's attorney suggesting that the government was interested in LaFond] | WP | 67 |
| 20. | "Based upon the words in this memorandum, did you realize that there was some interest that the government had in pursuing Mr. LaFond?" | WP | 67 |
| 21. | "What did you do with respect to Mr. LaFond and these issues described in the memorandum after reading this memorandum?" | WP | 67 |
| 22. | "Why did you make that recommendation [that LaFond obtain separate counsel]?" | WP | 68 |
| 23. | "Why did you recommend [Joe Duffy from Chicago] [to serve as LaFond's separate counsel]?" | WP | 69 |
| 24. | "Did you believe that it would be in Mr. Afremov's interest to have Mr. LaFond retain Mr. Duffy?" | WP | 69 |
| 25. | "Did you see any ethical concerns or problems with such an agreement [to have Afremov reimburse Duffy's fees]"? | WP | 71 |
| 26. | "Did you believe that it was inappropriate for [S&H lawyers] to continue to remain involved in assisting the representation of Mr. Afremov?" | WP | 73 |
| 27. | "If you had believed it was inappropriate, would you have had the ability to instruct the Sulloway & Hollis people to cease being involved in representing [Afremov]?" | WP | 73-74 |
| 28. | "Regardless of your belief, Mr. Kelley, did you believe it was your authority and power as Mr. Afremov's attorney to instruct the Sulloway & Hollis people to cease being involved in assisting in the representation of Mr. Afremov during the investigation?" | WP A/C | 74 |
| 29. | "Based upon your conversations with Sulloway & Hollis, did you ever believe you had the authority to tell them to cease to be involved?" | WP | 74 |
| 30. | "And I take it during the time your office represented Mr. Afremov in the investigation, your office was aware of the possibility that criminal charges could be brought against Mr. Afremov for the way in which the receipt of income was reported with respect to his original 2000 and 2001 returns?" | WP | 83-84 |
| 31. | "Was that [learning in November 2005 that the government tentatively viewed LaFond as a "subject" of the investigation] any surprise to you, based upon the events of the previous year?" | A/C WP | 89 |

| 32. | "Did you tell Mr. Afremov that Mr. Shea had identified Mr. LaFond as the subject of the investigation?" | A/C | 90 |
|---|---|---|---|
| 33. | "And pursuant – or following on this discussion, did it remain ultimately your decision at this juncture in terms of your representation of Mr. Afremov whether or not to assert an advice of counsel defense?" | WP | 92 |
| 34. | "Did you ever tell Mr. Afremov that Mr. Vicinanzo is a lawyer who practices in the area of white collar criminal defense?" | A/C | 94 |
| 35. | "Mr. Afremov filed an affidavit in which he claimed that he had no idea Mr. Vicinanzo was a lawyer practicing in the area of white collar criminal defense.  To you knowledge, would that affidavit be false?" | A/C | 94-95 |
| 36. | "Do you believe that such agreement [by Afremov to indemnify S&H for Nixon Peabody costs and fees] was in any way inappropriate?" | WP | 96 |
| 37. | "At that point, in your – well, at that point [when Kelley and Nixon Peabody filed briefs opposing the government's motion to compel production of privileged S&H materials] did you believe that the interests of Sulloway & Hollis and Mr. Afremov were, in fact, aligned?" | WP | 109 |
| 38. | "Is there any material difference in the arguments with respect to the content of the documents in the privilege log between the positions taken by the Nixon Peabody firm on behalf of Sulloway & Hollis and your firm on behalf of Mr. Afremov?" | WP | 109 |
| 39. | "And did you believe at the time that occurred [the addition of Stetler Duffy firm to the joint defense agreement] that there was a common interest between the Stetler & Duffy firm and your firm with respect to the representations in the ongoing investigation?" | WP | 121 |

Def. Mem. in Support of Mot. to Compel Answers, pp. 3-7.

The questions at issue from Afremov's deposition and the basis for the instruction not to answer (along with the page number of the deposition) are as follows:

| No. | Questions to Michael Afremov | Obj. | P. |
|---|---|---|---|
| 1. | "Okay.  What did he [Doug Kelley] tell you?" [With reference to phone call in which plaintiff learned he had been indicted for tax fraud] | A/C | 17 |
| 2. | "Did Mr. Berman recommend that you retain different counsel?" | A/C | 19-20 |

| 3. | "Do you remember making any revisions to the content of this affidavit [signed on March 19, 2008 as part of plaintiff's plea agreement] before the final version was printed out so you could sign it; yes or no?" | A/C | 32 |
|---|---|---|---|
| 4. | "Did you tell Mr. Kelley at any point during the time that he represented you of the involvement of Mr. LaFond that you've described for me here today in terms of money from 2001?" | A/C | 160 |
| 5. | "Did you tell Mr. Kelley at any point during the time he represented you that the rug agreements that we've just discussed were, in fact, false?" | A/C | 161 |
| 6. | "Did you tell Mr. Kelley at any point during the time that he represented you that you, in fact, had no obligation to repay any of the money you received from Mr. Fischer or Mr. Packard?" | A/C | 161 |
| 7. | "Did you tell Mr. Kelley at any point during the time he represented you that the checks that you sent to Mr. Fischer and to Mr. Packard were, in fact, part of an unlawful conspiracy? | A/C | 161 |
| 8. | "Did you tell Mr. Kelley at any point during the time he represented you that you – you believed that you and Mr. LaFond participated in some kind of conspiracy beginning in 2001?" | A/C | 161 |
| 9. | "Do you know whether or not anybody on your behalf ever went to the Faegre firm to ask whether the statements expressed in Exhibits 32 and 33 were not the full, correct and complete listing of reasons for the Faegre firm's withdraw [sic]?" [With reference to reasons for Faegre firm's withdrawal from representation of plaintiff in the AGA litigation] | WP | 177 |
| 10. | "Did you have a full and fair opportunity to advise Mr. Chamberlain of all the facts you thought were important to you regarding Exhibits 36 and 37?"  [With reference with plaintiff's independent counsel's review and approval of amendments to S & H fee agreement] | A/C | 195 |
| 11. | "And could you have told him [Chamberlain] if you'd wanted to, about the events that you say happened between Mr. LaFond and yourself in 2001?" | A/C | 196 |
| 12. | "Did you, in fact, tell Mr. Chamberlain of the circumstances that you've described for me here today which you believe occurred between yourself and Mr. LaFond starting in 2001?" | A/C | 197 |
| 13. | "And did you discuss the terms of the success bonus with Mr. Chamberlain; yes or no?" | A/C | 199 |
| 14. | "And did you have an opportunity – not saying whether you did or not – did you have an opportunity to report whatever Mr. LaFond said to Mr. Chamberlain?" | A/C | 199 |

| 15. | "I'm not saying if you did or not.  Could you have, if you wanted to, reported that [communications with Mr. LaFond about the success bonus] to Mr. Chamberlain?" | A/C | 199 |
|---|---|---|---|
| 16. | "What correspondence have you seen which leads you to believe that they were sure you wouldn't get the company?" | WP | 203 |
| 17. | "Have you seen documents that are – you say correspondence. Was it internal correspondence within the Sulloway firm?" | WP | 204 |
| 18. | "What did Mr. Kelley tell you what was at stake – what was at stake with respect to these subpoenas?"  [With reference to government subpoenas issued in November and December 2004] | A/C | 258 |
| 19. | "And if you wanted to you could have at any point during Mr. Kelley's representation of you, you could have told him of what you now believe to be Mr. LaFond's role in the events, correct?" | A/C | 263 |
| 20. | "Did you tell anybody else from Mr. Kelley's office of the facts you now claim with respect to Mr. LaFond's role in 2001?" | A/C | 263 |
| 21. | "Did you authorize Mr. Kelley to do anything he believed was necessary to investigate the potential charges against you?" | A/C | 263-64 |
| 22. | "Did you authorize Mr. Kelley to, if he wanted, inspect the entire Sulloway & Hollis file, including any notes of Mr. LaFond?" | A/C | 264 |
| 23. | "Do you know whether, during the investigation at any point up until the time of the indictment, Mr. Kelley did, in fact, have access to the entire Sulloway Hollis file to include any notes of Mr. LaFond?" | A/C | 264 |
| 24. | "Did you ask Mr. Kelley about the wisdom of retaining the Stetler & Duffy firm?"  [With reference to S&H's separate counsel in the subpoena-response matter] | A/C | 266 |
| 25. | "Did you ask Mr. Kelley about the wisdom of having the Sulloway & Hollis firm retain the Nixon Peabody firm to conduct the privilege review?" | A/C | 266 |

Id., pp. 7-9.

### B.    Kelley's Deposition and Waiver of Attorney Client Privilege and Work Product Protection

As a preliminary matter, the parties disagreed regarding Sasseville's role in Kelley's deposition.  Afremov's counsel argued that Sasseville's instruction to Kelley to follow Afremov's counsel's objections amounted to Sasseville asserting the objections

on Kelley's behalf.   Sept. 26. 2011 Tr., p. 54.   Defendants' counsel argued that Sasseville's agreement to abide by Afremov's counsel's objections was not the same as Sasseville making an independent determination that the questions invaded attorney-client privileged communications or the work product doctrine.  Id., p. 69.

This Court has reviewed the Kelley deposition transcript and agrees that Sasseville did not independently object to the questions on the basis of attorney-client privilege or work product.   Rather, Sasseville apparently decided not to override Afremov's counsel's objections.  Id., p. 28 ("Mr. Sasseville:  Don't answer.  You've been instructed by your former client's counsel.").  However, as previously discussed, Kelley's failure to assert work product protection or the attorney-client privilege does not foreclose Afremov from asserting the doctrines.   In re Green Grand Jury Proceedings, 492 F.3d at 983.

This Court has already set forth the law that governs the analysis of a waiver of the work product protection, and will not repeat it here.   See Section II, supra.   As for waiver of attorney-client communications, the Court looks to Minnesota state law to determine issues of attorney-client privilege and waiver of that privilege.   Baker, 209 F.3d at 1053.  The attorney-client privilege has been codified by Minn. Stat. §595.02(b), which provides:

> An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent.

The essential elements of the attorney-client privilege are: "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as

such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal advisor, (8) except the privilege may be waived."   Kobluk v. University of Minn., 574 N .W.2d 436, 440 (Minn.1998). "An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the court of professional duty * * *, without the client's consent."   Id. n. 4 (citing Minn. Stat. § 595.02, subd. 1(b) (1996)). The privilege is strictly construed and protects communications, not information.   Id. at 443 ("[T]he attorney-client privilege protects communications rather than information except to the extent that * * * disclosure would reveal confidential communications.") (internal quotation and citation omitted).   See also Kahl v. Minnesota Wood Speciality, Inc., 277 N.W.2d 395, 399 (Minn. 1979) ("[t]he privilege tends to suppress relevant facts and must be strictly construed.").

Because the attorney-client privilege belongs to the client, it may be waived explicitly by the client.   Kobluk, 574 N .W.2d at 440.   The court in Medtronic identified common factors in finding such a waiver, which include: (1) whether the assertion of the privilege is the result of an affirmative act; (2) through the affirmative act, the asserting party has placed the protected information at issue by making it relevant; and (3) application of the privilege would deny the opposing party access to information vital to its defense.   162 F.R.D. at 135.

For all of the reasons discussed in connection with defendants' motion to compel documents Afremov withheld from the K & W files based on the work product doctrine, this Court finds that Afremov's objections to questions put to both Kelley and himself

regarding Kelley's conversations with Afremov and Kelley's work product must be overruled.  Afremov has alleged there is an unwaivable conflict between S & H and Afremov.  Afremov has alleged that no one from S & H ever told him that LaFond had received the subject letter from the Department of Justice, and that he had no knowledge that Stetler & Duffy and Nixon Peabody were retained to represent the separate interests of LaFond and S & H rather than himself. By making these claims, all of which defendants dispute, Afremov has directly placed Kelley's knowledge and discussions with Afremov on these topics at issue.

Furthermore, Afremov has alleged that he and S & H entered into an agreement in which he hired S & H to provide legal services regarding the criminal investigation. FAC, ¶54; Pl. Mem. in Opp. Summ. J., pp. 3, 13.  Therefore, under Afremov's version of the relationship betwee Kelley and S & H, S & H was Kelley's co-counsel in the criminal investigation.  "When a client sues a lawyer for malpractice, the attorney-client privilege is waived as to all attorneys involved in the underlying litigation for which that attorney has been sued."  Rutgard v. Haynes, 185 F.R.D. 596, 598 (S. D. Cal. 1999); Kelsey-Hayes Co. v. Motor Wheel Corp., 155 F.R.D. 170, 172 (W. D. Mich. 1991) ("[o]ne waiver consequently waives the privilege as to all the lawyers working jointly on the matter… .").  As a result, Afremov's suit against defendants not only waives the attorney-client privileged communications between Afremov and S & H, but also between Afremov and S & H's "co-counsel," Kelley.  It is fundamentally unfair for Afremov to object to inquiries into "what Kelley knew and when" by the very lawyers Afremov has claimed were Kelley's co-counsel.

Additionally, this Court agrees with the defendants that Kelley is the exclusive source for the information defendants seek.  The defendants do not need information such as the nature and content of their own communications with Kelley.  They need Kelley's thoughts, opinions and communications with Afremov regarding S & H's work on the rug transactions and during the criminal investigation.  Only Kelley can supply that information.

Finally, whether based on their roles as co-counsel (as alleged by Afremov) or as parties to the JDA which permitted the sharing of "mental impressions, strategies, legal theories, …, including the confidences of each client …," (JDA, ¶III), it is evident to this Court that throughout his representation of Afremov, Kelley divulged to defendants his communications with Afremov and his mental impressions, legal strategies and opinions.  See Simpson Decl. (Kelley Dep.), p. 25 ("Q. Did you tell [LaFond] about the content of any of your communications with Mr. Afremov? A. "Occasionally"); p. 55 ("Q. Would it surprise you to find that at least some of your memoranda were given to Mr.LaFond or people at Sulloway & Hollis? A. No, it would not surprise me."); p. 61 ("Q. Did anyone from the Sulloway & Hollis firm make any kind of strategy or tactical decisions regarding the criminal investigations?"  A. Well, I discussed material strategy decisions with them, but I reserve[d] the right to make my own call in the end.").  Having opened the door to Kelley's communications and thought processes during the course of his representation of Afremov during the criminal investigation, Afremov cannot now slam shut that door and claim that the balance of Kelley's communications and work product are off limits, particularly when is the very nature of the joint representation that may drive the determination of whether there is or is not a conflict.

With this reasoning in mind, the Court now analyzes each of the questions at issue in this motion.[16]

### B. Kelley's Deposition and Waiver of Attorney Client Privilege and Work Product Protection

Question No. 1 ("Can you tell me what those discussions [i.e., discussions by Kelley with Mr. Afremov without Mr. LaFond being present before Kelley's firm was retained] entailed?") relates to discussions Kelley may have had with Afremov without LaFond present prior Afremov's retention of Kelley, before Afremov's retention of S & H to assist in the criminal investigation, and before the execution of the JDA.  The question  is too general and vague to find that it touches on claims or issues invoked by Afremov in this suit.  Kelley shall not be required to answer the question.

Question No. 2 ("How was the decision made with respect to imparting some of the content of communications with Mr. Afremov but not other content?") is too general and vague to find that it touches on claims or issues invoked by Afremov in this suit. Additionally, Kelley's rationale for divulging or not divulging certain of his communications with Afremov to defendants has no bearing on Afremov's claims. Kelley shall not be required to answer the question.

---

[16]    Although defendants set out the questions to which Afremov and Kelley were instructed to answer and the basis for the instruction (attorney-client communication, work product or both), neither party provided to the Court in their written submissions the basis for arguing or resisting waiver for each question.  At the hearing, defendants' counsel described for a few questions the underpinnings of his clients' argument that Afremov either placed the topics of the questions at issue (thereby waiving attorney-client privilege or work product doctrine) or that defendants' had a substantial need for the information characterized as work product.  Thus, for the most part, this Court was forced to engage in the unenviable task of divining for itself the grounds for determining whether the objections were or were not valid for each of question.

Question Nos. 3 ("Did you appreciate at that point, then, even in November of '04, that there was some possibility that Mr. LaFond's actions would be implicated in the investigation that was being—? [interrupted by objection]") and 4 ("So based upon this memo [Memo from Steve Wolter to Doug Kelley regarding cases in which attorneys aid their clients in evading income taxes] did you appreciate no later than November 15, 2004 that there was a possibility that the actions of Mr. LaFond in working with Mr. Afremov to file certain tax returns or amended tax returns could implicate Mr. LaFond in the investigation?") relate to Kelley's understanding that LaFond might be implicated in the tax filing scheme and criminal investigation.  According to defendants, this question "goes to the heart" of Afremov's claim that from the beginning it was improper for S & H to assist K & W in the criminal investigation because of the LaFond and S & H's conflict of interest.  Sept. 26, 2011 Tr., p. 19.  This Court agrees that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means.  Kelley must answer these questions.

Question No. 5 ("Did that memorandum [regarding ethical rules on the right of an attorney to believe a client's explanation] -- or those communications that you've just mentioned have any reference to Mr. LaFond's ability to believe Mr. Afremov's explanation of the transactions during the time Mr. LaFond represented Mr. Afremov?") relates to a memorandum written by Kelley's office regarding a lawyer's ethical duties "to believe a client's explanation." Simpson Decl., Ex. A (Kelley Dep.), pp. 42-43.  Kelley testified that he did not recall if someone from K & W had prepared the memorandum,

but that the issue had been discussed.  Id., p. 43.  The Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means.  Kelley must answer that question.

Question No. 6 ("Do you remember anything that Mr. Afremov said with respect to the substance of the rug transactions or the amended tax returns at these meetings [among signatories to the joint defense agreement]?") asks for Kelley's recollection of statements Afemov may have made in the presence of the parties to the JDA about the rug transactions.  This question does not necessarily invoke attorney-client privileged communication, as it is described in Kolbuk.  The question appears to be asking for factual statements Afremov made about the rug transaction.  In any event, to the extent that the question seeks attorney-client privileged statements, as the question seeks to learn information that Afremov communicated to not only Kelley, but other members of the JDA, which included S & H, there is a waiver of privilege as to the communication. Additionally, to the extent that Afremov may have made statements to Kelley alone that were consistent with or contradicted statements he made to S & H and LaFond about the rug story, defendants have a right to that information to support their theory that there was no conflict because their interests were completely aligned with Afremov's interests.  For these reasons, the Court concludes that as a consequence of Afremov's conflict of interest claim, the information sought is relevant to this claim, Afremov has put Kelley's knowledge on this topic at issue, and application of the attorney-client

58

privilege would deny defendants access to information vital to their defense. Kelley must answer this question.

Question Nos. 7-16 sought information regarding testimony offered in the AGA litigation regarding the rug story by Afremov and by Brian Packard and Fred Fischer, the AGA suppliers who made the payments to Afremov that were at issue in the AGA litigation. What Kelley knew about the truth of the rug story relates to the conflict of interest issue. These questions are designed to elicit support for defendants' theory that there was no conflict between themselves and Afremov as their interests were completely aligned with Afremov's interests. As to Question Nos. 7-13, the information sought is relevant to his conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue, and application of the attorney-client privilege would deny defendants access to information vital to their defense. Kelley must answer these questions. Regarding Question Nos. 14-16, the Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on the topics covered by these questions at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley shall answer these questions.

Question No. 17 ("Did you ever learn of facts to suggest that the information Mr. Eichten [a Kelley associate attorney] reported learning from Mr. Melemed [Afremov's accountant] in this memorandum was false?" [with reference to a report on a meeting with Melemed on December 3, 2004] relates to a memorandum written by a K & W attorney that was provided to S & H. Kelley Dep., pp. 55. Although the parties did not

provide the Court with a copy of the memorandum, the Court presumes it has to do with Melemed's work on the tax returns that were the subject of the criminal investigation and Melemed's understanding of the grounds for amending the returns. This issue bears directly on defendants' theory that there was no conflict between themselves and Afremov as their interests were completely aligned with Afremov's interests. Further, having provided the work product of K & W to S & H, Afremov's adversary in this suit, Afremov has not only waived the right to invoke the work product doctrine, but it would be fundamentally unfair to prevent further discovery into information bearing on the contents of the memorandum. For these reasons, the Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on the topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley shall answer this question.

Question No. 18 ("So why did you discuss tactical or strategy issues with the Sulloway & Hollis firm?") related to a series of questions and answers regarding joint meetings between K & W and S & H in which Kelley discussed "material strategy" decisions with S & H, including whether to assert the advice of counsel defense. Simpson Decl. (Kelley Dep.) pp. 56-65. This question goes to Afremov's claim that defendants had an unwaivable conflict and defendants' response that they did not because their interests were completely aligned with Afremov's until he pled guilty to tax fraud. Moreover, as Kelly had already disclosed to defendants his mental processes and strategies during the course of their joint representation of Afremov, Afremov

cannot preclude defendants from discovering why Kelley did this.  For these reasons, the Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on the topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley must answer this question.

Question Nos. 19 ("What was your understanding of whatever problems Mr. LaFond may have had at this point?"  [With reference to problems mentioned in a memo by a Kelley associate regarding a conversation with Melemed's attorney suggesting that the government was interested in LaFond]), 20 ("Based upon the words in this memorandum, did you realize that there was some interest that the government had in pursuing Mr. LaFond?"), and 21 ("What did you do with respect to Mr. LaFond and these issues described in the memorandum after reading this memorandum?") all relate to a memorandum prepared by Frank Hermann, Kelley's partner, about a conversation Hermann had with Paul Engh, the attorney for Melemed, Afremov's accountant, regarding the Government's interest in LaFond.  Simpson Decl. (Kelley Dep.), pp. 66-67.  These questions not only bear on Afremov's claim of a conflict of interest between S & H and Afremov, but having been given a copy of the memorandum either during the criminal investigation or as part of this litigation,[17] any right to assert the work product doctrine as to the topics covered in the document has been waived and it would be fundamentally unfair to prevent defendants from inquiring into topics bearing on the

---

[17]    Again, this memorandum was not provided to the Court.  Presumably defendants received it in the course of this litigation or during their representation of Afremov during the criminal investigation.

memorandum. For these reasons, the Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on the topics covered by these questions at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley must answer these questions.

Question Nos. 22-24 relate to Kelley's recommendation that LaFond retain separate counsel and his reasons for recommending Joe Duffy of the Stetler & Duffy law firm. These questions bear on the conflict of interest issues, as well as to Afremov's claim that he did not know that Stetler & Duffy and Nixon Peabody were representing S & H's and LaFond's separate interests. By asserting these claims, this Court finds that Afremov has waived any work product protection surrounding Kelley's recommendation. Further, as it was Kelley who affirmatively made the recommendation to LaFond that he retain separate counsel, it would be fundamentally unfair for Afremov to assert that defendants are not entitled to know why. For these reasons, the Court concludes that as a consequence of Afremov's conflict of interest claims and claims regarding the retention of Stetler & Duffy and Nixon Peabody, Afremov has put Kelley's knowledge on the topics covered by these questions at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Therefore, Kelley must answer these questions.

Question No. 25 ("Did you see any ethical concerns or problems with such an agreement [to have Afremov reimburse Duffy's fees?") relates to Afremov's claims that

he did not agree to reimburse LaFond for Stetler & Duffy's fees and that there was a conflict of interest at the time such an agreement was made, as well as Afremov's claim that he did not know that Stetler & Duffy was retained to represent LaFond's interests, and not his interests.  By making these claims, Afremov has waived any right to assert the work product doctrine as to these topics and additionally, it would be fundamentally unfair to prevent defendants from obtaining this information when it was Kelley who allegedly made the recommendation to LaFond to hire Duffy.  For these reasons, the Court concludes that as a consequence of Afremov's conflict of interest claims and claims regarding the retention of Stetler & Duffy, Afremov has put Kelley's knowledge on the topics covered by this question at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means.  Therefore, Kelley must answer this question.

Question No. 26 ("Did you believe that it was inappropriate for [S&H lawyers] to continue to remain involved in assisting the representation of Mr. Afremov?") goes directly to the conflict of interest issue.  The Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley must answer this question.

Question Nos. 27-29 do not invade attorney work product or attorney-client privilege.  The questions are factual—did Kelley have the authority and ability to instruct S & H to cease their representation of Afremov during the criminal investigation?

63

Further, even if the questions did seek information governed by the work product doctrine, Kelley was permitted to answer without objection similar questions regarding S & H's involvement in the criminal investigation. Simpson Decl., Ex. A (Kelley Dep.), p. 61 ("Q. Did anyone from the Sulloway & Hollis firm make any kind of strategy or tactical decisions regarding the criminal investigations?" A. Well, I discussed material strategy decisions with them, but I reserve[d] the right to make my own call in the end."); p. 73. ("Q. Did you ever tell them [S & H] that you believe it was inappropriate for them to remain involved in representing Mr. Afremov? A. No."). In any event, the Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on the attorney-client privilege and work product doctrine, defendants have a substantial need for the information, the information is crucial and unavailable by other means, and is vital to their defense. Kelley must answer these questions.

Question No. 30 ("And I take it during the time your office represented Mr. Afremov in the investigation, your office was aware of the possibility that criminal charges could be brought against Mr. Afremov for the way in which the receipt of income was reported with respect to his original 2000 and 2001 returns?") relates to defendants' claim that they advised Afremov to amend his returns to protect him from the possibility of criminal charges, based on the facts disclosed by Afremov to LaFond regarding payments by Fischer and Packard to him. Kelley's knowledge of defendants' rationale for advising Afremov to amend his returns, is relevant to defendants' theory that Kelley, as Afremov's counsel in the criminal investigation, agreed with defendants that their position was aligned with Afremov's position regarding the amendment of the

returns and the characterization of the payments from Fischer and Packard to Afremov in his 2002 return.  The Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means.  Kelley shall answer the question.

Question No. 31 ("Was that [learning in November 2005 that the government tentatively viewed LaFond as a "subject" of the investigation] any surprise to you, based upon the events of the previous year?") does not seek attorney-client communications, as asserted by Afremov.  Thus, his objection on this basis is overruled.  Further, by claiming that LaFond's role in the tax filing scheme created an irreconcilable conflict of interest (or was no conflict at all, as maintained by defendants), Afremov has waived any work product protection regarding Kelley's understanding of the situation.  The Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means.  Kelley must answer this question.

Question No. 32 ("Did you tell Mr. Afremov that Mr. Shea had identified Mr. LaFond as the subject of the investigation?") goes directly to Afremov's claim that he did not know that LaFond was a subject of the DOJ's investigation.  FAC, ¶58.  Following the objection and instruction to Kelley that he not answer the question based on the attorney-client privilege, Kelley testified that he told Afremov in the presence of LaFond,

(his co-counsel under Afremov's version of the facts) that LaFond was a subject of the investigation. Simpson Decl. (Kelley Dep.), p. 91. The Court concludes that as a consequence of Afremov's conflict of interest claims, the information sought is relevant to these claims, Afremov has put Kelley's knowledge on this topic at issue, and application of the privilege would deny defendants access to information vital to their defense. Kelley is ordered to answer this question.

Question No. 33 ("And pursuant – or following on this discussion, did it remain ultimately your decision at this juncture in terms of your representation of Mr. Afremov whether or not to assert an advice of counsel defense?") relates to the scope of Kelley's representation vis á vis S & H and his perception of any conflict of interest with S & H in so far as Kelley considered asserting an "advice of counsel" defense on Afremov's behalf. Kelley shall be required to answer this question for several reasons. First, the Court notes that Kelley was permitted, without objection, to answer virtually the same question regarding his ultimate authority to assert the advice of counsel. Simpson Decl., Ex. A (Kelley Dep.), p. 65 ("Q. Whose ultimate decision was it whether or not to waive the privilege [the advice of counsel defense]? A. It was mine."). Thus, to the extent that Afremov asserted work product to prevent Kelley from answering the question, he had already waived the protection by allowing Kelley to answer the same question earlier in the deposition. Second, asking Kelley who had the ultimate authority to do something does not seek Kelley's work product. Finally, even if the question did seek Kelley's work product and had not been waived by his answer to the same question, by asserting an unwaivable conflict, the Court concludes that Afremov has put Kelley's knowledge on this topic at issue and waived his right to withhold this

information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley must answer this question.

Question Nos. 34 ("Did you ever tell Mr. Afremov that Mr. Vicinanzo is a lawyer who practices in the area of white collar criminal defense?") and 35 ("Mr. Afremov filed an affidavit in which he claimed that he had no idea Mr. Vicinanzo was a lawyer practicing in the area of white collar criminal defense. To your knowledge, would that affidavit be false?") relate to Afremov's allegation that he did not know that Nixon Peabody was retained for any purpose other than to assert privileges on his behalf in connection with the DOJ investigation. Declaration of Michael Afremov, ¶10, 11-13 [Docket No. 170]. The implication of that assertion is that Afremov did not know that LaFond was the subject of the DOJ investigation and would require the services of a white collar criminal defense attorney. The Court concludes that as a consequence of Afremov's claim that he was never told that LaFond was the subject of the criminal investigation, the information sought is relevant to this claim, Afremov has put Kelley's knowledge on this topic at issue, and application of the attorney-client privilege would deny defendants access to information vital to their defense. Kelley must answer these questions.

Question Nos. 36 ("At that point, in your – well, at that point [when Kelley and Nixon Peabody filed briefs opposing the government's motion to compel production of privileged S&H materials] did you believe that the interests of Sulloway & Hollis and Mr. Afremov were, in fact, aligned?"), 37 ("Is there any material difference in the arguments with respect to the content of the documents in the privilege log between the positions

taken by the Nixon Peabody firm on behalf of Sulloway & Hollis and your firm on behalf of Mr. Afremov?"), and 38 ("Is there any material difference in the arguments with respect to the content of the documents in the privilege log between the positions taken by the Nixon Peabody firm on behalf of Sulloway & Hollis and your firm on behalf of Mr. Afremov?") go to directly to Afremov's claim regarding conflict of interest and defendants' defense that their interests and Afremov's were aligned. Before asking these questions, defendants established that Kelley reviewed the draft of the brief filed by Nixon Peabody on behalf of S & H and that Nixon Peabody reviewed Kelley's draft of Afremov's opposition brief. Simpson Decl., Ex. A (Kelley Dep.), pp. 108-109. By sharing drafts of his briefs with his now adversary (S & H) and by making a claim of a conflict of interest, Afremov has waived any right to assert the work product protection to the answers to these questions. Further, the Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has put Kelley's knowledge on this topic at issue, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley must answer these questions.

Question No. 39 ("And did you believe at the time that occurred [the addition of Stetler Duffy firm to the joint defense agreement] that there was a common interest between the Stetler & Duffy firm and your firm with respect to the representations in the ongoing investigation?") asked whether Kelley believed that there was a common interest between K & W and the Stetler & Duffy law firm, the firm representing LaFond. The question goes to directly to Afremov's claim regarding conflict of interest and defendants' defense that their interests and Afremov's were aligned. The Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov has

put Kelley's knowledge on this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Kelley must answer the question.

### C.    Afremov's Deposition and Waiver of Attorney Client Privilege and Work Product Protection

Question No. 1 ("Okay. What did he [Doug Kelley] tell you?" [With reference to phone call in which plaintiff learned he had been indicted for tax fraud]) invades attorney-client privileged communication on a subject that has not been placed at issue by Afremov. Afremov does not need to answer this question.

Question No. 2 ("Did Mr. Berman recommend that you retain different counsel?") relates to Afremov's testimony that after he was indicted, but while still represented by Kelley, he met with attorney Frank Berman. Simpson Decl., Ex. B (Afremov Dep.), p. 18-19 [Docket No. 259]. Whether or not Berman advised Afremov to retain different counsel is irrelevant to any issue in this case and Afremov does not need to answer this question.

Question No. 3 ("Do you remember making any revisions to the content of this affidavit [signed on March 19, 2008 as part of plaintiff's plea agreement] before the final version was printed out so you could sign it; yes or no?") relates to an affidavit Afremov signed in connection with his plea agreement. This question does not invade the attorney-client privilege, or attorney work product (which was not asserted as a basis for

instructing Afremov not to answer the question).[18]    Thus, Afremov's objections are overruled.  Afremov shall answer this question.

Question Nos. 4-8 all relate to defendants' claim that there was no conflict of interest between defendants and Afremov because defendants believed the rug transactions were legitimate and their interests were aligned with Afremov.  The Court concludes that as a consequence of Afremov's conflict of interest claims, Afremov's assertion of the unwaivable conflict of interest waives any attorney-client privilege as to these communications, the information sought is relevant to these claims, and application of the privilege would deny defendants access to information vital to their defense.  Afremov must answer these questions.

Question No. 9 ("Do you know whether or not anybody on your behalf ever went to the Faegre firm to ask whether the statements expressed in Exhibits 32 and 33 were not the full, correct and complete listing of reasons for the Faegre firm's withdraw [sic]?" [With reference to reasons for Faegre firm's withdrawal from representation of plaintiff in the AGA litigation]) relates to Afremov's understanding as to why Faegre & Benson withdrew from representing him.  The FAC alleges that LaFond lied to Afremov about the reasons for "local counsel's" (i.e. Faegre & Benson's) withdrawal when LaFond knew the primary reason for the withdrawal was local counsel's refusal to participate in the tax filing scheme.  FAC, ¶25.  The Court concludes that as a consequence of

---

[18]    Even if the work product doctrine had been asserted, or the question had sought information subject to the attorney-client privilege, this Court finds that in light of Afremov's claim that defendants had an unwaivable conflict and defendants' response that their interests were aligned until the point that he entered the plea of guilty, Afremov has put this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, the information is crucial and unavailable by other means, and application of the attorney-client privilege would deny defendants access to information vital to their defense.

Afremov's claim that he was never told the true reason for Faegre & Benson's withdrawal of representation, Afremov has put this topic at issue and waived his right to withhold this information based on work product doctrine, defendants have a substantial need for the information, and the information is crucial and unavailable by other means. Afremov must answer the question.

Question Nos. 10 ("Did you have a full and fair opportunity to advise Mr. Chamberlain of all the facts you thought were important to you regarding Exhibits 36 and 37?" [With reference with plaintiff's independent counsel's review and approval of amendments to S & H fee agreement]), and 11 ("And could you have told him [Chamberlain] if you'd wanted to, about the events that you say happened between Mr. LaFond and yourself in 2001?") do not seek attorney-client privileged information, only facts. Further, even if the questions sought privileged information, the Court finds that the questions relate to Afremov's allegation that his agreement to the November, 2003 amendment to his fee agreement with S & H was "extracted" from him "under duress and without appropriate consultation." FAC, ¶41. Afremov has placed the information sought by Questions Nos. 10 and 11 at issue and defendants' access to the information is vital to their defense on this issue. Therefore, Afremov must answer these questions.

Question No. 12 ("Did you, in fact, tell Mr. Chamberlain of the circumstances that you've described for me here today which you believe occurred between yourself and Mr. LaFond starting in 2001?") relates to whether Afremov disclosed to the attorney he retained to review the proposed amendment to S & H's fee agreement, Chamberlain, the circumstances of LaFond's involvement in the rug transactions. To the extent that Afremov discussed LaFond's role in the rug transactions with the attorney reviewing the

amendment to the fee agreement, the Court finds that information relevant to the conflict of interest claims and the claims Afremov had made regarding the "unconscionable" fee agreement "extracted" by S & H.  Afremov has placed the information sought by this question at issue and defendants' access to the information is vital to their defense on this issue.  Afemov must answer the question.

Question Nos. 13 ("And did you discuss the terms of the success bonus with Mr. Chamberlain; yes or no?"), 14 ("And did you have an opportunity – not saying whether you did or not – did you have an opportunity to report whatever Mr. LaFond said to Mr. Chamberlain?") and 15 ("I'm not saying if you did or not.  Could you have, if you wanted to, reported that [communications with Mr. LaFond about the success bonus] to Mr. Chamberlain?") relate to Afremov's review of the proposed success bonus with Mr. Chamberlain.  Arguably, the questions do not seek attorney-client privileged information, only facts.  But even if the questions could be construed to seek privileged information, the Court finds that information sought is relevant to the conflict of interest claims and the claims Afremov has made regarding the "unconscionable" fee agreement with S & H.  Therefore, Afremov has placed the information sought by these questions at issue, and defendants' access to the information is vital to their defense on this issue.  Afremov must answer these questions.

Question Nos. 16 ("What correspondence have you seen which leads you to believe that they were sure you wouldn't get the company?") and 17 ("Have you seen documents that are – you say correspondence.  Was it internal correspondence within the Sulloway firm?") relate to whether LaFond told Afremov that he was confident that Afremov would be awarded AGA in the state court action, and how an award of the

company to Afremov would affect the payment of fees to S & H.  Simpson Decl., Ex. B

(Afremov Dep.), pp. 203-206.  It appears that these questions relate to Afremov's claim

in FAC ¶41 that in exchange for simply deferring payment of $400,000 in fees, S & H

secured Afremov's agreement to a potential success bonus of $20 million to S & H and

local counsel, over and above the hourly fees.  According to the FAC, such a fee

arrangement was "unconscionable, not supported by sufficient consideration, and

unreasonable on its face."  Had Defendants disclosed all relevant facts, and consulted

with Afremov about those facts, Afremov never would have agreed to the Success

Bonus."  FAC, ¶42.  These questions go to the reasonableness of the success bonus

and the amendments to Afremov's fee agreement with S & H—issues Afremov has

raised in his suit.  FAC, ¶¶36, 41, 42, 45, 46, 49-52.  The Court concludes that as a

consequence of these claims, Afremov has waived his right to withhold this information

on this topic based on work product doctrine, defendants have a substantial need for

the information, and the information is crucial and unavailable by other means. Afremov

must answer these questions.

Question No. 18 ("What did Mr. Kelley tell you what was at stake – what was at

stake with respect to these subpoenas?"  [With reference to government subpoenas

issued in November and December 2004]) relates to what Kelley told Afremov about the

subpoenas issued by the Government to Afremov and his company in connection with

the criminal investigation of the tax filing scheme and bears on Afremov's knowledge of

and understanding of the conflict of interest that may have developed between S & H

and Afremov after Afremov was subpoenaed.  The Court finds that the information

sought is relevant to Afremov's conflict of interest claims, Afremov has placed the

information sought by this question at issue, and defendants' access to the information is vital to their defense on this issue.  Afremov must answer this question.

Question Nos. 19 ("And if you wanted to you could have at any point during Mr. Kelley's representation of you, you could have told him of what you now believe to be Mr. LaFond's role in the events, correct?") and 20 ("Did you tell anybody else from Mr. Kelley's office of the facts you now claim with respect to Mr. LaFond's role in 2001?") go to the heart of Afremov's conflict of interest claims and defendants' assertion that Afremov only changed his story regarding the rug transactions and tax filings at the time he pled guilty to tax fraud.  Afremov has placed the information sought by this question at issue, and defendants' access to the information is vital to their defense on this issue. Afremov must answer these questions.

Question No. 21 ("Did you authorize Mr. Kelley to do anything he believed was necessary to investigate the potential charges against you?") concerns the scope of Kelley's representation in the criminal investigation.  Defendants have maintained that to understand their position that there was no conflict between them and Afremov, an understanding of Kelley's role in the criminal investigation is required.  The Court finds that by alleging the irreconcilable conflict, Afremov has put those facts that bear on this claim at issue, and defendants' access to the information is vital to their defense on this issue.  Afremov must answer this question.

Question Nos. 22 ("Did you authorize Mr. Kelley to, if he wanted, inspect the entire Sulloway & Hollis file, including any notes of Mr. LaFond?") and 23 ("Do you know whether, during the investigation at any point up until the time of the indictment, Mr. Kelley did, in fact, have access to the entire Sulloway Hollis file to include any notes of

Mr. LaFond?") relate to Kelley's ability to access information that may have implicated LaFond in the tax filing scheme, and ultimately his role in the criminal investigation. Defendants have maintained that to understand their position there was no conflict between them and Afremov, an understanding of Kelley's role in the criminal investigation is required. The Court finds that by alleging the irreconcilable conflict, Afremov has put those facts that bear on this claim at issue, and defendants' access to the information is vital to their defense on this issue. Afremov must answer these questions.

Question Nos. 24 ("Did you ask Mr. Kelley about the wisdom of retaining the Stetler & Duffy firm?" ([With reference to S&H's separate counsel in the subpoena-response matter]) and 25 ("Did you ask Mr. Kelley about the wisdom of having the Sulloway & Hollis firm retain the Nixon Peabody firm to conduct the privilege review?") implicate Afremov's claim that he did not understand that these law firms were being retained to represent LaFond's and S & H's interests. FAC, ¶¶59-61. The Court finds that by making this allegation, Afremov has put those facts that bear on this claim at issue, and defendants' access to the information is vital to their defense on this issue. Afremov must answer these questions.

In summary, with the few exceptions noted by the Court above, this Court concludes that Afremov has failed to establish that the information sought in his deposition or Kelley's deposition should be withheld based on attorney-client privilege or the work product doctrine. By making the claims he has asserted in this case, Afremov has impliedly waived the attorney-client privilege by placing the information sought at issue, and the information is vital to defendants' defense. As to information that

Afremov claims is subject to the opinion work product doctrine, defendants have established that "the information allegedly protected is crucial and unavailable by other means." Pamida, 281 F.3d at 732. In the interests of a "healthy adversary system," the protection must give way. Id.

Afremov's request for fees and costs in connection with responding to defendants' motion is denied.

## III.    AFREMOV'S MOTION TO COMPEL DOCUMENTS [Docket No. 188]

Afremov moved to compel the production of documents responsive the following requests from his First Request for Production of Documents:

> Request No. 10: All documents relating to communications with any person other than Afremov relating to the Joint Defense Agreements, Tax Returns, Fees Agreements, or Criminal Proceedings, specifically including communications with:…(c) Nixon Peabody, LLP (d) Stetler & Duffy, Ltd….

> Request No. 11: All documents relating to communications with Joseph Dixon, Henry Shea, or other representative of the United States Government relating to the Tax Returns, Fee Agreements, or Criminal Proceedings.

> Request No. 12: All documents relating to the April 1, 2008 letter from David Vicinanzo at Nixon Peabody, LLP to Joseph Petrosinelli at Williams & Connolly, LLP relating to the December 9, 2004 joint defense agreement, including without limitation any and all memoranda, notes, communications, and meeting minutes relating to the drafting, reviewing, authorizing or discussing the same.

> Request No. 13: All billing and time records relating to Afremov, with the exception of those previously produced as Bates S & H 00337-1970 and S & H 2594-2776.

> Request No. 14: All documents relating to communications with your criminal defense counsel (including without limitation Nixon Peabody, LLP and Stetler & Duffy, Ltd.) relating to the payment of counsel's fees, costs, and expenses incurred in conjunction with the representation

related to Afremov, the Tax Returns, the Joint Defense Agreements, and/or the Criminal Proceedings.

<u>Request No. 15</u>:   All documents reflecting payments received by your criminal defense counsel (including without limitation Nixon Peabody, LLP and Stetler & Duffy, Ltd.) in connection with representation related to Afremov, the Tax Returns, the Joint Defense Agreements, and/or the Criminal Proceedings, including without limitation all bills or invoices from said criminal defense counsel.

<u>Request No. 16</u>:  All documents relating to communications or meeting between any persons associated with Defendants relating to the retention of criminal defense counsel by Defendants (including without limitation Nixon Peabody, LLP and Stetler & Duffy, Ltd.), the scope of the representation, and the reasons for hiring separate defense counsel for Mr. LaFond, including without limitation any and all memoranda, notes, communications, meeting minutes, and retainer agreements relating to the same.

<u>Request No. 31</u>:  All documents relating to communications or meetings between any persons associated with Sulloway & Hollis, P.L.L.C. relating to the receipt of the subpoena directed to Michel LaFond in 2005, the subpoena directed to Sulloway & Hollis, P.L.L.C. in 2005, and any "subject letter" sent to Michel LaFond and/or Sulloway & Hollis, P.L.L.C. in 2005 or 2006, or relating to any response to the same.

<u>Request No. 32</u>:  All documents relating to, or produced in response to, any subsequent subpoena or request for information sent to, or served upon, Defendants in connection with the Criminal Proceedings.

Afremov also moved to compel the production of documents responsive to the

following two requests from his Fourth Request for Production of Documents:

<u>Request No. 41</u>:     Any   and   all   documents   and communications setting forth, constituting or relating to any internal Sulloway & Hollis P.L.L.C. policy, including but not limited to any written policies, firm policy manuals, firm announcements to you, relating to the policy or policies of Sulloway & Hollis P.L.L.C. in place from 2001 through 2006 relating to the handling of conflicts of interest and waivers of those conflicts.

> Request No. 42:    Any   and   all   documents   and
> communications  constituting  conflict  disclosure  and/or
> conflict  waiver  correspondence  authored  by  LaFond  from
> 2001  to  2006.    Client  information  may  be  redacted  from
> documents produced pursuant to this Request.

Plaintiff's Memorandum of Law in Support of Motion to Compel Documents ("Pl. Mem. in Support of Mot. to Compel"), p. 2-3, 5 [Docket No. 191].

Defendants objected to Requests Nos. 10-16, 31 and 32, asserting attorney-client privilege and the work product doctrine.  Id., p. 3.  Nonetheless, in February, 2010, defendants produced 987 pages of documents with the prefix "NP," indicating that the documents were from the Nixon Peabody file.  Affidavit of Gerald Fornwald in Support  of  Plaintiff's  Motion  to  Compel  Documents  ("Fornwald  Aff."),  Ex.  C (correspondence from defendants' counsel's firm to Afremov's counsel indicating that the  documents  produced  came  from  the  Nixon  Peabody  firm)  [Docket  No.  192]. Defendants also produced 188 pages of documents from the Stetler & Duffy firm.  Id. Defendants  did  not  produce  any  documents  from  Nixon  Peabody  or  Stetler  &  Duffy responsive to Document Requests Nos. 10-16 or 31 and 32.  Pl. Mem. in Support of Mot. to Compel, p. 4.  The universe of documents potentially responsive to these requests comprised over 200 boxes of documents, and are maintained at S & H's offices in New Hampshire.  Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Compel ("Def. Mem. in Opp. to Mot. to Compel"), p. 5 [Docket No. 196]. According to defendants, they made the documents available for inspection to Afremov in New Hampshire, but Afremov's counsel twice cancelled appointments to review them. Id.; Declaration of Charles E. Jones Regarding Plaintiff's June 14, 2011 Motion to Compel ("Jones Decl. in Opp. to Mot. to Compel"), ¶9 [Docket No. 197]. The gist of

defendants' argument regarding these 200-plus boxes of documents is that they have fulfilled their obligations by making the documents available for inspection as the documents were kept in the normal course of business at S & H's offices.[19]

Document Request No. 38 sought a privilege log, which defendants refused to produce on the ground that "any such communications [between defendants and any of their attorneys of record] [were] irrelevant to any of the claims and defenses asserted in this matter and are otherwise outside the scope of discovery and on the ground that producing such a privilege log would be unduly burdensome."  Fornwald Aff., Ex. B (Defendants' Response to Document Request No. 38].  Defendants produced a partial privilege log the week of the motions hearing and provided a copy to the Court.  Motion to Compel Tr., p. 15 [Docket No. 209].  The privilege log did not reflect documents from the Stetler & Duffy firm.  Afremov's counsel objected to the descriptions of documents contained on the log, which without exception, stated only "email correspondence" or "email correspondence with attachment(s)."  Id., pp. 15-18.  Further, defendants did not provide a key to the authors of the documents on the log, hindering Afremov's ability to test defendants' basis for withholding the documents.  Id., p. 16-17.

Defendants objected to Requests Nos. 41 and 42 on the ground that the burdensomeness of locating responsive documents outweighed the minimal relevance of the documents sought.  Fornwald Aff., Ex. F (Defendant's Responses to Document Requests Nos. 41 and 42).  At the motions hearing, defendants' counsel indicated that

---

[19]    At the hearing, defendants' counsel represented that S & H had gathered the documents in 2005 when responding to the grand jury subpoena, and so the documents have been in their current state of organization for nearly six years.  Motion to Compel Tr., pp. 33-34. Thus, pursuant to Fed. R. Civ. P. 34 (b)(2)(E)(i), defendants made the documents available for inspection "as they [were] kept in the normal course of business… ."

he had produced all documents in defendants' possession responsive to this request, albeit after Afremov brought his motion compel.  However, defendants continued to assert (and would not withdraw) their objections to the request.  Motion to Compel Tr., pp. 27-30.

Finally, Afremov sought the return of documents from the K & W file he claimed to have inadvertently produced, and which reflect information protected by the work product doctrine.  Pl. Mem. in Support of Mot. to Compel, p. 7.  On April 29, 2011 counsel for defendants wrote to Afremov's counsel, stating:

> [t]he production of documents your office made includes too many documents to identify that contain various K & W work product, mainly handwritten notes.  Given that, the clear relevance of the information, and K & W's decision to waive whatever separate work production (sic) protection it may have had, your decision to withhold many documents with K & W notes (whether handwritten or typed) is inconsistent, at best, and further shows that whatever protection may have previously attached has been waived.

Fornwald Aff., Ex. L.  Defendants' counsel identified at least some of the documents at issue by Bates number.  Id.  Afremov's counsel responded on May 4, 2011, asking defendants' counsel to identify the documents he was referencing and to eliminate them from his file.  Id., Ex. M.  Afremov's counsel restated its request to defendants' counsel by telephone on May 5, 2011, and in writing on May 6, 2011.  Fornwald Aff., ¶18, Ex. K.  Defendants' counsel agreed to segregate only the documents he specifically identified.  Id., Ex. N.

Afremov argued that defendants violated Fed. R. Civ. P. 26(b)(5)(B)[20] by failing to segregate or destroy documents defendants' counsel deemed contained work product protected information.  In response, defendants submitted that they were not obligated to return or destroy the documents since it was defendants' counsel, not Afremov's counsel, who identified the documents as containing work product protected information.  Def. Mem. in Opp. to Mot. to Compel, p. 7.  Further, defendants objected to what they considered to be Afremov's effort to force defendants to review the documents and identify those they considered to contain work product protected information—a task defendants asserted should not fall to them, but to Afremov.  Id., p. 8.

Regarding Afremov's motion to compel, at the hearing the Court ordered the following:

With respect to Document Requests Nos. 10 through 16, 31 and 32, the Court concluded that defendants were in the best position to review the documents at S & H's offices and to select responsive, non-privileged documents for production.  Therefore, the Court granted Afremov's request that defendants produce the documents responsive to these requests.

With respect to Document Requests Nos. 41 and 42, defendants were required to withdraw their objections and to indicate in their written response that all responsive documents have been produced.  To the extent that defendants withheld any of the

---

[20]     Fed. R. Civ. P. 26(b)(5)(B) requires that a party notified that material produced in discovery is subject to a claim of privilege or protection as trial preparation material "must promptly return, sequester, or destroy the specified information and any copies it has… ."

documents on the basis of privilege or the work product doctrine, these documents were ordered to be included on the privilege log.

With respect to defendants' privilege log, the Court found the log to be inadequate by failing to provide the information to which Afremov is entitled so that he can challenge whether a document has been appropriately withheld.  "A privilege log must provide sufficient details from which it can be determined whether each document is actually protected from disclosure by a privilege."  Zimmerman v. Poly Prep Country Day School, Civ. No. 09-4586, 2011 WL 2601481 at *3 (E.D.N.Y. June 30, 2011).  A privilege log may be judged deficient when it contains only "a cursory description of each document, the date, author, recipient, and 'comments.'"  United States v. Construction Prods. Research, Inc., 73 F.3d 464, 473 (2d Cir.1996).  See also Browne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 474 (S. D. N.Y. 1993) (privilege log that provided only a "skeletal" description of the subject of the document was insufficiently informative to support the privilege claims asserted).  Therefore, defendants were ordered to provide not only the names of the authors and recipients of the documents, but to also identify the individuals sufficiently so that Afremov could test whether the documents were properly withheld.  Furthermore, describing the document as "email correspondence" or "email correspondence with attachment" was deemed inadequate.  Defendants were directed to provide Afremov with sufficient information regarding the subject matter of the document to be able to challenge its designation as privileged.

With respect to Afremov's request that defendants identify and sequester or destroy inadvertently produced work product protected documents, the Court concluded

that defendants must identify by Bates number the documents defendants' counsel has already determined reflect privileged or work product protected information, as reflected in counsel's April 29, 2011 correspondence.  However, defendants were not ordered to review all of the documents produced by Afremov to determine if any other documents were inadvertently disclosed.  If Afremov believes there may have been an inadvertent disclosure of other privileged or protected documents, the Court held that it is ultimately his burden to identify those documents and make a request for their return.

All documents ordered to be produced pursuant to this portion of the Court's order, and an amended privilege log were ordered produced on or before June 28, 2011.

## IV.    AMENDMENTS TO THE PRETRIAL ORDER

As a result of the discovery ordered to be produced pursuant to this Order, the Court contemplates that the parties may need to amend the Fifth Amended Pretrial Scheduling Order.  Within one week of the date of this Order, the parties shall confer regarding any amendments they may seek to make to the scheduling order and jointly submit any proposed revisions to the schedule.  If the parties cannot agree on all proposed changes to the scheduling order, they shall submit to the Court and serve on each other their respective proposals no later than one week from the date of this Order, along with a letter, not to exceed three pages, explaining why their proposal should be adopted and their opponent's proposal rejected.

J.S.M.